FILED

02/08/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0521

DA 14-0521

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 25

_____

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

RICHARD FRANKLIN REYNOLDS,
a/k/a RICHARD ADKINS,

      Defendant and Appellant.

_____

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DC 12-37A
Honorable Holly Brown, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Chief Appellate Defender, Chad Robert Vanisko, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Tammy K Plubell, Assistant
Attorney General, Jesse Laslovich, Special Assistant Attorney General,
Helena, Montana

          Marty Lambert, Gallatin County Attorney, Bozeman, Montana

_____

                Submitted on Briefs:  December 7, 2016

                        Decided:  February 8, 2017

Filed:

_____
                  Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1     Richard Reynolds (Reynolds) appeals his conviction for securities fraud on speedy trial grounds and, alternatively, asks for a new trial on the basis that the District Court erred when instructing the jury.  At trial, the District Court refused Reynolds' proposed jury instructions, which included language regarding exemptions to the statutes under which he was charged—§§ 30-10-201(1) and -202(1), MCA.  The District Court used the State's proposed instructions instead, which omitted the references to the statutory exemptions.  Reynolds' objections to the District Court's refusal of his proposed jury instructions form the basis of this appeal, in addition to the denial of his motion to dismiss for lack of a speedy trial.  We affirm and restate the issues on appeal as follows:

*1. Whether Reynolds was denied his right to a speedy trial guaranteed by Article II, Section 24 of the Montana Constitution.*

*2. Whether the District Court erred when it refused Reynolds' proposed jury instructions referencing exemptions to §§ 30-10-201 and -202, MCA.*

### FACTUAL AND PROCEDURAL BACKGROUND

¶2     The State filed an Information against Reynolds, charging him with multiple felony counts that alleged fraud, theft by embezzlement, failure to register as a securities salesperson, failure to register a security, and operating a fraudulent pyramid promotion scheme.  Reynolds' schemes and frauds were far-reaching and victimized not only Montanans, but people throughout the country.  The State's charging documents reflected the complexity of his scheme and listed or referenced 141 witnesses across the country by their initials.  Although Reynolds targeted some unsophisticated investors for smaller amounts, he fooled some who were experienced and convinced many to part with

2

substantial sums. Reynolds accumulated over $5.3 million from these individuals and kept approximately $4.3 million for his own personal use.

¶3 The complexity of Reynolds' schemes matched the scale of his takings. Reynolds created false companies that purportedly engaged in gold mining, trading, currency exchange, and other plausible-sounding market activities. He gave the companies names like Buffalo Investment Corporation, Buffalo Investment Group Incorporated, Buffalo Exchange Company, Buffalo Extension, Real World Direct Corporation, Consulting Investors Incorporated, Plus 5 Market Incorporated, and United Consultant Investment Corporation. Reynolds asked his investors to sign confidential questionnaires that enabled him to deny requests to inspect company books, allowing him to shuffle funds between these companies as often as he liked. He made himself CEO or president of each company and ensured that only he or he and his wife were the sole signatories to the corporate accounts.

¶4 After taking money from individuals, Reynolds would generate and send fictional statements showing remarkable returns on the purported investments. Sometimes, when investors were suspicious of their remarkable good fortune, they would test Reynolds by asking him to return a portion of their initial investment. Reynolds would comply, using shuffled funds from other investors to ease their mind. Eventually, however, he failed to return money when it was demanded. In July of 2011, one investor asked to withdraw $10,000 of his investment, but never received it. In September of 2011, that same investor asked that the entirety of his $75,000 be returned. He never received that either.

3

Similar misfortune befell others as Reynolds' schemes became more and more unsustainable.

¶5     Lynne Egan (Egan) is a forensic accountant trained in securities investigations, financial analysis, and financial forensics.  She is a non-practicing Certified Public Accountant and Deputy Securities Commissioner for the Montana Commissioner of Securities and Insurance.  This agency oversees the Securities Department of the State Auditor's Office, which reviews applications of individuals seeking to offer and sell securities in Montana.  Egan first encountered Reynolds in June of 2009, when she counseled him on how to comply with a Cease and Desist order her office had issued against him.  In the spring of 2011, Reynolds again garnered her attention when her office fielded multiple inquiries regarding his offerings and sales of securities.  These inquiries eventually prompted her to investigate whether Reynolds had violated Montana securities statutes.  As part of her investigation, she met with the FBI regarding Reynolds' activities and spoke with investors who had given him money.  By subpoenaing bank statements for his personal and business accounts, Egan was able to track Reynolds' financial activities and potential securities violations.

¶6     Reynolds never registered any of his business entities with Montana's Securities Department as Montana law required.  His Private Placement Memoranda (PPM), which served as a prospectus for potential investors, stated that his offerings were exempt from registration requirements.  Indeed, not every issuer of securities in Montana must register.  If an issuer wishes to claim a registration exemption, however, he must apply for and be approved for that exemption through Egan's office.  Egan testified she could not identify

4

any exception upon which Reynolds could have relied. Additionally, she indicated he would not have been granted an exemption from her office. His PPMs, she testified, contained unreasonable promises of 100 percent returns every 90 days, and other concerning language that she had never encountered before in a PPM. Additionally, the state of Missouri had issued a Cease and Desist order relating to fraud against Reynolds within the last five years, also making Reynolds ineligible for an exemption. Egan thus testified she would never have approved an exemption for Reynolds.

¶7 Reynolds eventually discovered Egan's investigation. In order to avoid detection, Reynolds did not fly, but drove to Atlanta in November of 2011 for an investors' meeting. Once in Atlanta, Reynolds confessed in the meeting that the fantastic returns on the statements he had sent were fabricated. He informed the investors at the meeting that he had been moving funds between his companies to cover losses and support failing companies. A witness to the meeting testified that Reynolds said, "[T]hey've got stuff on me. Lynne Egan has probably 20 counts on me and four or five of them will probably stick."

¶8 Egan did indeed have "stuff" on him. She had tracked every investment, expenditure, and investor connected with Reynolds. She compiled all of this information, including the names, addresses, email addresses, and telephone numbers for each investor into a 120-page report. On February 22, 2012, the State filed an Information against Reynolds and requested issuance of a warrant. During a subsequent bond hearing, at which the District Court continued bond for $10,000,000, Reynolds admitted he was aware of the charges and warrant for his arrest, but nonetheless chose not to turn himself

5

in. Electing instead to continue his business dealings, he eluded capture until July 5, 2012—134 days after the State filed its Information. Another 19 days would pass until his initial appearance. The District Court scheduled his omnibus hearing 28 days later on August 21, 2012, but postponed it three times, at Reynolds' request, until November 20, 2012—91 days after the original omnibus date. After the omnibus hearing, the State requested a trial in March or April of 2013, and the District Court would have set trial in May of 2013. However, defense counsel objected as he would not have sufficient time to prepare his case by then, preferring instead a trial date in July. The court's next available date, however, was August 5, 2013. The State's requested trial date would have represented a 192-day span, but the defendant's request for additional time added another 66 days—258 days in total. Defense requests to continue trial after the initial date added another 120 days of delay, until December 3, 2013, when Reynolds finally had his trial. A total of 650 days passed from the day the State filed the Information until trial. Reynolds filed a motion to dismiss for lack of a speedy trial in August 2013, which the District Court denied after conducting an *Ariegwe* analysis.

¶9 Reynolds could not afford his bond and so spent much of the delay before trial in Gallatin County Detention Center. Despite complaints of overall discomfort, Reynolds testified the jail administrators made genuine efforts to run a quality facility. These administrators, at the direction of the District Court, agreed to make special accommodations to allow him greater access to a computer and other materials to assist in his defense. However, Reynolds maintained that these accommodations were inadequate and insisted on a daily work-release program or house arrest instead.

¶10 Before entering Gallatin County Detention Center, Reynolds suffered from chronic lower back pain, high blood pressure, excessive weight, and type II diabetes. While there, his conditions did not deteriorate significantly. Although the detention center hospitalized him for refusing his medication, which he said made him ill, he did have an x-ray of his lower back, saw an orthopedic surgeon for his back problems, and lost weight. He eventually felt well enough in the detention center to write songs and literature that would potentially earn him money. The high-carbohydrate prison diet exacerbated his diabetes, however. He was not able to control his diet until his release to house arrest. While under house arrest, which the District Court granted in June of 2013, Reynolds saw a chiropractor and slept on a special mattress in his home for his back pain. His house arrest meant he had access to 3 file cabinets and 27 banker's boxes containing materials relating to his defense. At home, he could work in an office with access to all of his files, except for those he had encrypted, and the only thing he wanted was more time to spend on his defense.

¶11 Reynolds contends the State was uncooperative throughout the discovery process, hindering his attempts to move his case forward, and necessitating his requests for additional time. Many of these contentions centered on electronic discovery. The State seized hard disks from Reynolds' computers, which it then searched for relevant documents. The State obtained its search warrant for these drives on October 29, 2012, and created electronic images of the drives. These images, given to defense counsel on March 14, 2013, were replicas of information contained on the physical disks seized from Reynolds. In addition, the State supplied a memorandum from the forensic detective who

created the duplicate discs, Dana McNeil (McNeil), explaining how the images should be accessed and alerting counsel that some portions of the data were encrypted. McNeil also told defense counsel to notify him of any problems with the images as he would be happy to assist. Not until August 2013, however, nearly six months later, did defense counsel contact McNeil. Reynolds could not access portions of encrypted data and so asked that the drives be cloned.[1] McNeil provided these cloned copies on September 18, 2013. The Defense continued having difficulty accessing the full range of electronic data, but never retained an expert for assistance and never requested access to the original drives.

¶12    The State continued to comply with its on-going discovery obligations by producing discovery from September 2012 through August 2013. Although Reynolds asserts the State's production of discovery was piecemeal and untimely, the volume of materials it received prevented a single and immediate disclosure. Office of the Public Defender paralegal Kate Beckman testified she spent approximately 80 hours organizing more than 15,000 pages of documents provided by the State. These 80 hours spanned five months, May through October, in 2013—approximately five hours per week. Thus, although her office received these documents October 9, 2012, defense review did not begin until May of 2013. This release of documents included Egan's 120-page dossier. Office of the Public Defender investigator Glenn Farrell testified that as of October 7, 2013, only 31 witnesses had acknowledged his investigatory efforts and that he had not

---

[1] Cloning and imaging are similar processes that replicate information from a computer's hard disk, but through different mediums. Cloning a hard disk requires another hard disk that becomes the "clone," containing all the same information as the original. Imaging encapsulates the information from the original hard disk and places it into a file that can be later examined with software. That file can then be placed onto a portable medium, like a thumb drive.

been able to verify the identities of any witness. Yet, on direct examination during his speedy trial hearing, Reynolds testified his trial preparation efforts were proceeding quickly; that he had access to all his files; and, other than wanting more time to prepare, he was generally happy while at home, working on his defense.

## STANDARD OF REVIEW

¶13 We review a district court's findings of fact underlying a speedy trial claim for clear error. *State v. Ariegwe*, 2007 MT 204, ¶ 119, 338 Mont. 442, 167 P.3d 815. A court's findings of fact are clearly erroneous if they are not supported by substantial credible evidence, if the court misapprehended the effect of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been made. Whether factual circumstances amount to a speedy trial violation when evaluated according to a four-factor balancing test is a question of constitutional law that we review de novo, to determine whether the lower court's interpretation and application of the law are correct. *Ariegwe*, ¶ 119.

## DISCUSSION

¶14 *1. Whether Reynolds was denied his right to a speedy trial guaranteed by Article II, Section 24 of the Montana Constitution.*

¶15 An accused's right to a speedy trial is guaranteed by United States Constitution Amendments Six and Fourteen, and by Article II, Section 24 of the Montana Constitution. A reviewing court must analyze a potential speedy trial violation by balancing four factors: (1) the length of the delay; (2) the reasons for the delay; (3) the accused's assertion of his right to a speedy trial; and (4) the prejudice to the accused as a

9

result of the delay. *Ariegwe*, ¶ 20. A minimum 200 days must elapse between the speedy trial clock's commencement and the date of trial before a speedy trial claim merits analysis. *Ariegwe*, ¶ 41.

*Factor One: The length of the delay*

¶16 The speedy trial clock commences at the earliest of either arrest, indictment, information, or complaint, and runs until the date of trial, or the date a guilty plea is entered. *Ariegwe*, ¶¶ 42-43.

¶17 Here, there is no dispute that the span of days between the State filing its Information and Reynolds' trial exceeded the 200-day threshold. The length of the delay past the 200-day threshold was 450 days, for a total of 650 days.

*Factor Two: The reason for the delay*

¶18 Under the second factor, the Court must identify each period of delay in bringing the accused to trial. *Ariegwe*, ¶ 63. The Court must then attribute each period of delay to the appropriate party and assign weight to the period based on the specific cause and motive for the delay. *Ariegwe*, ¶ 67.

¶19 We consider the extent to which the delay stretches beyond the 200-day trigger date because a presumption of prejudice to the accused arises at the trigger point. That presumption intensifies as the delay exceeds the trigger date: the greater the excess over the trigger date, the more likely the accused suffered prejudice. *Ariegwe*, ¶ 49. The intensifying effect of the presumption does not relieve the accused of providing evidence of prejudice. *Ariegwe*, ¶ 51. "The further the delay stretches beyond the trigger date, the more compelling the State's justifications for the delay must be under Factor Two."

*Ariegwe*, ¶ 107.   When delay is caused by the complexity of the case, less weight is assigned to the State.   *Ariegwe*, ¶¶ 70-71.   A valid reason for delay is assigned less weight than bad faith, negligence, or even institutional delays beyond control of the prosecution. *Ariegwe*, ¶ 70.

¶20    Here, 450 days beyond the threshold indicates the State would normally bear a heavy burden to show the delay has not prejudiced Reynolds.   Such a delay would likewise mitigate Reynolds' burden to show undue prejudice.   However, this case is undisputedly complex, as evidenced by the voluminous files in evidence and the large number of victims and witnesses who were spread throughout the country.   The complexity of these proceedings and nature of the underlying investigation weigh in the State's favor.

¶21    The initial period of delay was between February 22, 2012, and July 5, 2012—the time between the filing of the Information and Reynolds' arrest.   This 134-day period is entirely attributable to Reynolds and weighs heavily against him as he knew the Information had been filed, but made no effort to surrender or inform law enforcement of his whereabouts.   Indeed, the record supports the contention that he deliberately hid in his hotel room in an effort to postpone or avoid altogether his capture and trial.   Reynolds stayed in the same hotel room for at least 77 of those 134 days.

¶22    The second period of delay is the 19 days between his arrest in Kansas and his initial appearance in Gallatin County District Court on July 24, 2012.   These days are attributable to the State as institutional delay since the time was needed to transport Reynolds from Kansas to Montana and then set an appearance date.   The State is assigned

11

almost no weight for this delay, however, as the Defendant would not have required transport had he not attempted to avoid capture.

¶23    The third period of delay consists of 119 days from July 24, 2012—Reynolds' initial appearance—to November 20, 2012—the date of Reynolds' omnibus hearing. The record reflects that 28 days of this delay are attributable to the State and considered institutional delay due to the District Court's limited availability to conduct omnibus hearings. The remaining 91 days are attributed to Reynolds because of his requests for additional time to prepare. These continuances are attributed to Reynolds, but are assigned little weight due to the complexity of the case.

¶24    The next period of delay consists of 258 days between November 20, 2012—the omnibus hearing—and the first trial date set for August 5, 2013. The State requested a trial date in March or April, but the court had available only a date in May. Defense counsel objected that he would not have sufficient time to prepare and would prefer instead a date in July. The court had no availability in July, and so set trial for August 5. Since the court would have set trial for May at the earliest based on the State's request, the delay from November 20, 2012, to May 31, 2013—192 days—is institutional delay that is assigned less weight to the State. The remaining 66-day delay from May 31, 2013, to August 5, 2013, is attributed to Reynolds and assigned little weight as the result of his counsel's request for more time to prepare.

¶25    The final period of delay is the 120 days between the first trial date of August 5, 2013, and the continued trial date of December 3, 2013. This period of delay is the result of defense requests to continue trial for additional time to prepare and is, therefore,

attributed to the defense. This delay is assigned little weight as reasonable diligence might necessitate additional time for counsel to prepare, given the volume of evidence and complexity of the case.

¶26 We conclude that 239 days of delay are attributable to the State, but none weigh heavily against it as the delays were institutional and resulted from the necessities inherent in bringing a complex case to trial. By contrast, 411 days are attributed to the Defendant, and 134 of those days weigh heavily against him for consciously avoiding the authorities who sought his arrest.

*Factor Three: the accused's response to the delay*

¶27 An accused's responses indicate whether he actually wanted a speedy trial and inform the court as to whether there has been a deprivation of the speedy trial right. *Ariegwe*, ¶ 84. "[W]hether the accused actually wanted to be brought to trial promptly is an 'important' consideration in ascertaining whether his or her right to a speedy trial has been violated." *Ariegwe*, ¶ 76. Responses to delays must be viewed under the totality of the circumstances and in light of the accused's other conduct. *Ariegwe*, ¶ 80.

¶28 As we noted above, Reynolds caused 411 days of delay himself. Of those 411 days, 277 were caused by his requests for additional time to prepare. Although he argues the State is to blame for these days because of dilatory discovery tactics, the record tells a different story. The defense did not timely examine the hard disk when it was given to them, and the problems with encrypted files and reading the data on the digital images likely could have been quickly addressed by an expert. The defense never hired an expert and chose instead to request cloned drives, which increased the delay. Although the

13

defense received more than 15,000 pages of documents from the State in October of 2012, Kate Beckman did not begin her review until May of 2013—nearly eight months later. Even then, the time she spent organizing and reviewing these documents was not substantial and she did not proceed at a hurried pace, but rather five hours per week. Lynne Egan's 120-page report, included in those documents, provided every investor's name, address, phone number, and email address. By the time of the District Court's speedy trial hearing, nearly a year after these documents were produced, the defense investigator had contacted only 31 witnesses. Notwithstanding these points of defense delay, Reynolds testified at the speedy trial hearing that his defense was not suffering or impaired. He had access to a substantial volume of files—27 banker's boxes, and three file cabinets' worth, in addition to those contained in his office computer—and only wanted for more time. We therefore cannot say these 277 days, linked to Reynolds' desire for more time, were due to dilatory tactics or "piecemeal" releases of discovery by the State. We count these delays instead as evidence Reynolds desired more time than diligence would have required and that he did not actually want a speedy trial.

¶29 The initial delay of 134 days, however, unquestionably stemmed entirely from Reynolds' avoidance of the law. He hid in his hotel room rather than surrender himself to authorities to begin the proceedings against him. We weigh this period against the Defendant too, and assign heavy weight for the delay against Reynolds. He deliberately avoided apprehension and indicated no interest at all in having a speedy trial. Additionally, his testimony at his speedy trial hearing discredits the notion that he actually wanted a speedy trial when what he really wanted was additional time to prepare.

14

We conclude therefore that Reynolds did not actually want a speedy trial, which weighs heavily against him in the balancing of the four factors.

*Factor Four: prejudice to the accused*

¶30 Under factor four, the reviewing court must examine the interests of the defendant that the Speedy Trial right was designed to protect. *Ariegwe*, ¶ 86. The United States Supreme Court enumerated these interests: (1) preventing oppressive pre-trial incarceration; (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired. A reviewing court may find prejudice to the accused under any one or all of these factors. *Ariegwe*, ¶ 88.

*1. Preventing oppressive pre-trial incarceration*

¶31 Reynolds argues that his incarceration inhibited his ability to participate in his defense preparation. "[T]he length of the pretrial incarceration that is 'oppressive' is less for a relatively simple offense than it is for a complex charge." *Ariegwe*, ¶ 91. Although his incarceration was lengthy, the charges against Reynolds and the preparation required for them, were complex. While incarcerated, he was treated for his medical conditions and able to pursue worthwhile activities like writing literature and songs. Additionally, the record demonstrates through Reynolds' own testimony that detention staff were willing to accommodate his defense preparation efforts—accommodations never before afforded to other prisoners. Reynolds never found these proposals satisfactory, however, and chose not to avail himself of them. Despite the District Court's concerns about his flight risk, the expansive and portable nature of his crimes, and his unabashed willingness to continue engaging in similar enterprises, the District Court ultimately allowed

15

Reynolds to spend much of his pretrial incarceration at home—nearly six months—where he had access to all of his files, a computer, additional medical care of his choosing, and a special mattress for his back. Given these facts, we do not find his pretrial incarceration was oppressive.

### 2. *Minimizing anxiety and concern of the accused*

¶32 When analyzing anxiety and concern, the Court focuses on ways the pending charges have unduly disrupted the accused's life or aggravated the anxiety and concern inherent in being accused of a crime. Nonetheless, a certain amount of anxiety naturally accompanies being accused of a crime, and the speedy trial guarantee is designed to minimize it, not eliminate it altogether. *Ariegwe*, ¶ 97. We do not see evidence in the record that Reynolds endured anxiety and concern beyond that ordinarily accompanying being accused of a crime. Although his life was disrupted in that he was no longer able to work, the nature of the charges against him was such that his work constituted a massive criminal enterprise—a salient point his incarceration was meant to address. Further, his release to house arrest in July of 2013 mitigated the disruptions to his life, and he was able to work at home on his defense preparation as he liked, and sleep in his own bed.

### 3. *Limiting the possibility that the defense will be impaired*

¶33 Limiting the impairment of the defense is the most important of the factors to address when examining whether the accused was prejudiced by delays leading to his trial. A defense impaired by pretrial delay undermines the fairness of the criminal justice system. *Ariegwe*, ¶ 98. Reynolds argues that his inability to access files while

16

incarcerated and the State's piecemeal discovery impaired his ability to participate in his defense preparation. These arguments do not align with the record. Reynolds' testimony at the District Court's speedy trial hearing on October 7, 2013, indicates he was pleased with how his defense preparations were proceeding, and that he had access to all of his files, other than those he had encrypted. Although the case was voluminous, the State's efforts to supply discovery were ample. The State's delivery of records to the defense on October 9, 2012, supplied significant detail regarding the State's case. Among these documents was Egan's 120-page compilation detailing investors, investments, and thorough contact information for the State's witnesses. Although the Defendant could not access his encrypted files, and could not timely view the electronic disk images supplied by the State, these difficulties coincide with the defense's decision not to hire an expert with experience in such things. The State likewise cannot be responsible for the defense's decision to start organizing its case in May of 2013 instead of October 9, 2012, when the 15,000 pages of documents and Egan's report were received. Neither is the State responsible for the defense's delay in interviewing witnesses; only 31 were contacted by the defense investigator as of October 7, 2013, despite Egan providing all of their contact information on October 9, 2012, nearly one year earlier. We cannot conclude that Reynolds' alleged impairment of his defense was the State's responsibility.

*Balancing*

¶34    In the final analysis, we find that although Reynolds' pretrial delay was lengthy, lengthy delays often are necessary and must accompany highly complex criminal litigation. Further, we find Reynolds did not want a speedy trial. With the great majority

17

of pretrial delay attributed to him, the record demonstrates Reynolds wanted to avoid trial altogether. At a minimum, he wanted more time to prepare his defense, efforts of which began late. Finally, even if he did desire a speedy trial, we cannot see that he was prejudiced by the delays. The District Court's denial of Reynolds' motion to dismiss for lack of a speedy trial is therefore affirmed.

¶35    *2. Whether the District Court erred when it refused Reynolds' proposed jury instructions referencing exemptions to §§ 30-10-201 and -202, MCA.*

¶36    A district court has correctly instructed a jury in a criminal case when, taken as a whole, the instructions fully and fairly instructed the jury on the law applicable to the case. *State v. Cybulski*, 2009 MT 70, ¶ 34, 349 Mont. 429, 204 P.3d 7 (citing *State v. Archambault*, 2007 MT 26, ¶ 14, 336 Mont. 6, 152 P.3d 698). We review a district court's broad discretion to instruct a jury for an abuse of that discretion. *Cybulski*, ¶ 34. A district court abuses its discretion if its actions are arbitrary or exceed the bounds of reason and substantial injustice results. *Cybulski*, ¶ 34 (citing *State v. Bieber*, 2007 MT 262, ¶ 22, 339 Mont. 309, 170 P.3d 444). The district court's decisions regarding jury instructions are presumed correct, and the appellant bears the burden to prove they are in error. *State v. Carnes*, 2015 MT 101, ¶ 6, 378 Mont. 482, 346 P.3d 1120. We consider any mistakes in a jury instruction to be reversible error only if the instruction prejudicially affected the defendant's substantial rights. *Cybulski*, ¶ 34. Although a jury must be instructed on each theory supported by the record, defendants are not entitled to instruct the jury on every nuance of their theory of the case. *Cybulski*, ¶ 36. A district

18

court therefore does not err when it refuses a proposed instruction containing language with no application to the defendant's case. *See Cybulski*, ¶ 36.

¶37 Reynolds sought to include language in his proposed instructions that had no application to his case. Reynolds' proffered instructions differed from the District Court's in that they referenced language relevant to circumstances in which Reynolds' transactions or securities would be exempt from Montana's securities regulations under § 30-10-105(8)(a), MCA. That additional language had no application to Reynolds' case because eligibility for the exemptions requires the person offering or selling the securities to have first registered in Montana pursuant to § 30-10-201, MCA. Admin. R. M. 6.10.301(2) (2016). Egan, as the person in charge of securities registration for the State, testified that Reynolds had never submitted a registration application. On that basis alone, Reynolds did not qualify for an exemption. However, even if Reynolds was otherwise qualified for an exemption under § 30-10-105, MCA, the Administrative Rules of Montana preclude an exemption when, within five years prior to registration, someone affiliated with the sale of securities[2] is subject to a state administrative enforcement order in which fraud or deceit was found. Admin. R. M. 6.10.301(3)(c) (2016). Reynolds was

---

[2] Administrative Rule of Montana 6.10.301(3) (2016) incorporates the Federal Administrative Rules to identify the parties the rule is meant to cover. The relevant portion of 17 C.F.R. § 230.262(a) (2017) is reproduced here: "the issuer; any predecessor of the issuer; any affiliated issuer; any director, executive officer, other officer participating in the offering, general partner or managing member of the issuer; any beneficial owner of 20% or more of the issuer's outstanding voting equity securities, calculated on the basis of voting power; any promoter connected with the issuer in any capacity at the time of filing, any offer after qualification, or such sale; any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with such sale of securities; any general partner or managing member of any such solicitor; or any director, executive officer or other officer participating in the offering of any such solicitor or general partner or managing member of such solicitor[.]"

subject to such a State Administrative Enforcement Order issued in May of 2009 in Missouri—less than five years before the Buffalo entities and UCIC were begun in Montana. This Missouri Cease and Desist order against Reynolds identified his multiple violations of Missouri code provisions relating to general fraud. Administrative Rule of Montana 6.10.301(3)(c) unquestionably applied to Reynolds: he was an issuer and executive officer of the fraudulently created entities. Additionally, the Missouri order, which found he had engaged in fraudulent behavior, was in effect at the time the Buffalo and UCIC entities were created. Reynolds was therefore precluded from qualifying for the exemptions under § 30-10-105(8)(a), MCA, even if he had registered as required.

¶38 Since the District Court reasoned along these same lines when refusing Reynolds' instruction containing the exemption language, we cannot say the District Court's refusal was an abuse of its discretion. Neither can we say the given instruction failed to fully instruct the jury on the law applicable to the case. The State's instructions plainly identified the wrongful conduct and mental state required for a conviction under the statute. The State's instructions thus fully instructed the jury as to the applicable law. Since the instructions given at trial fully and fairly informed the jury as to the applicable law, and the District Court's refusal was neither arbitrary nor unreasonable, the District Court did not commit reversible error by refusing Reynolds' instructions. On this basis, Reynolds' request for a new trial with different jury instructions is denied.

**CONCLUSION**

¶39    The judgment of the District Court denying the Defendant's motion to dismiss for lack of a speedy trial, and denying the Defendant a new trial on the basis the jury was not properly instructed, is affirmed.


/S/ LAURIE McKINNON


We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ JIM RICE