FILED

08/09/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0158

DA 16-0158

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 196

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

MARY NEWMAN REOPELLE,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-15-177
Honorable Robert L. Deschamps, III, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Dana A. Henkel, Terrazas Clark Henkel, P.C., Missoula, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

          Kirsten H. Pabst, Missoula County Attorney, Karla Painter, Deputy
County Attorney, Missoula, Montana

Submitted on Briefs: May 24, 2017

Decided: August 9, 2017

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Mary Newman Reopelle (Reopelle) appeals her conviction for felony deceptive practices entered in the Fourth Judicial District Court, Missoula County, following a jury trial. Reopelle raises the following issues on appeal:

1. *Whether the court abused its discretion by admitting evidence of Reopelle's prior investigations and convictions for fraudulent deceptive practices.*

2. *Whether the court abused its discretion in allowing an expert witness to testify over Reopelle's objection that the State's notification was late.*

3. *Whether the court abused its discretion when it declined to give a proposed jury instruction for misdemeanor theft.*

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 On January 14, 2015, Cecile Sorensen (Sorensen), an employee at Missoula Federal Credit Union (MFCU), received six checks issued on January 13, 2015, from Academy Bank. The checks, totaling $17,999.79, were for the following amounts: $2,999.94, $2,999.98, $2,999.99, $2,999.95, $2,999.96, and $2,999.97. The checks were drawn on an account belonging to "Shawn Garvin" and were designated for deposit into Reopelle's MFCU account, which had been recently opened and had a minimal balance of $5. Sorensen thought the check values were suspicious and her manager instructed her to contact Reopelle to see if she was expecting the deposits. Reopelle confirmed she was expecting the checks. Sorensen, while intending to place a hold on the checks until they cleared, accidentally entered improper codes which allowed Reopelle to access the deposits immediately.

¶3 On January 15 and 16, 2015, Reopelle withdrew from her MFCU account cash in the amounts of $9,800 and $7,500. Next, she deposited most of the funds into an account at Wells Fargo under the name of "Shawn Garvin." The funds were deposited in three denominations: $2,300, $5,700, and $7,500—all on January 16, 2015. On January 20, 2015, Reopelle withdrew an additional $500 from her MFCU account. Academy Bank did not honor the six checks deposited in Reopelle's MFCU account because the Academy account had been closed due to bad check activity. Reopelle explained to MFCU manager, Carrie Schuster (Schuster), that "Shawn Garvin" was her boyfriend, whom she had met on the internet. Reopelle, however, had never met him personally. Reopelle provided Schuster with the receipts for the deposits she had made into the Wells Fargo account.

¶4 Missoula City Police Department was notified and Detective Stacy Lear (Detective Lear) obtained a search warrant for Reopelle's residence. Several cell phones, computers, and other electronic devices were recovered. One of Reopelle's cell phones contained a number for "Shawn Garvin." Detective Lear called the number, left a message, and did not receive a response. Reopelle was charged with felony deceptive practices, which was later amended to felony deceptive practices or, alternatively, felony theft.

¶5 The State declared it would be introducing evidence of four prior investigations, commencing in 2008, of fraudulent online financial crimes involving Reopelle and two recent misdemeanor convictions for deceptive practices. The first investigation was in July 2008, when Detective Ben Slater (Detective Slater) of the Missoula City Police

3

Department investigated a Nigerian online financial scam involving Reopelle and her attempt to cash a counterfeit check for $3,800 issued by "Robert Burkhart." Reopelle was considered a victim of the scam and Detective Slater believed he counseled Reopelle, as was his usual practice, on how to avoid being victimized by internet financial schemes.

¶6     In 2011, Detective Lear interviewed Reopelle regarding another Nigerian online financial scam in which Reopelle was believed to be involved. Reopelle explained that she was offered a "job opportunity" from "Jim Ray" through an email. The email included a list of names, addresses, and dollar amounts with instructions for Reopelle to fill in the information on blank checks she would be receiving. Reopelle received approximately fifty checks from "Jim Ray," filled in the amounts as directed, and Reopelle herself received $200 from "Jim Ray." Reopelle gave law enforcement receipts for four wire transfers to Nigeria which totaled $1,540. Detective Lear cautioned Reopelle about these types of online fraudulent scams and that she should avoid any participation in them in the future. Reopelle was not charged with any offense.

¶7     In 2011, a law enforcement agency from New York contacted Detective Lear for assistance in a fraud investigation involving a purported sale of a snow blower by Reopelle to the victim, Regina Sullivan (Sullivan). Sullivan said that she sold a snow blower on Craigslist to Reopelle and received a check as payment. Sullivan received an amount that was more than the cost of the snow blower and was instructed by Reopelle to deposit the check and send the excess amount back to Reopelle. Sullivan was subsequently advised by her bank that Reopelle's check was dishonored.

¶8 In October 2012, an employee of Nightingale Nursing Home reported to law enforcement that she was concerned one of her clients, Reopelle, was possibly being scammed based on Reopelle's possession of checks for large amounts and Reopelle's emails. Officer Randy Long (Officer Long) responded and Reopelle explained that her long distance boyfriend of four years, "Morak Lauren," whom Reopelle had never met, sent her money orders through Western Union. Officer Long noted that the email address was an address associated with internet scams. Additionally, a phone number on Reopelle's cell phone from another man Reopelle had met online and "dated" was also associated with online fraudulent financial scams. Officer Long determined that Reopelle should not be charged and educated Reopelle about internet scams.

¶9 Reopelle's prior convictions arise from two incidents. The first concerned an investigation in September 2014, arising out of a report the Missoula City Police Department received from law enforcement in Colorado that Thomas Davis (Davis) had sent a $730 postal money order to Reopelle to purchase a gun listed for sale on the internet. Officer Kasey Williams (Officer Williams) of the Missoula City Police Department interviewed Reopelle. Reopelle admitted that a man she met on the internet named "Morak Lauren" had told her she was going to receive a check in the mail for $700 and instructed Reopelle to immediately cash the check and wire that amount by Western Union to "Adebunmri Lanre" in Nigeria. Reopelle followed the instructions hoping that "Morak Lauren" would follow through on his promise to marry Reopelle. Officer Williams counseled Reopelle on internet scams.

¶10 The second offense concerned a complaint from Larry Prior (Prior) and an inquiry from the Montana Office of Consumer Protection. Prior reported that he had sent Reopelle a money order for $630 as payment for a gun listed on the internet. Prior never received the gun. Detective Lear interviewed Reopelle and she admitted that she had received the $630 payment, but that "Morak Lauren" had told her Prior was his partner and instructed her to cash the money order and wire the amount to "Odebunmi Olufemi Lanre" in Nigeria.

¶11 Detective Lear issued two citations for misdemeanor deceptive practices arising from these incidents involving Davis and Prior. On November 26, 2014, Reopelle entered a guilty plea to both charges and was sentenced on January 16, 2015—the same day she withdrew cash from her MFCU account and made three separate deposits totaling $15,500 into a Wells Fargo account for "Shawn Garvin." Prior to charging Reopelle, Detective Lear confirmed with Reopelle's case manager that Reopelle was not suffering from any mental incapacity and that Reopelle managed her own financial affairs.

¶12 In the instant proceedings, a jury trial was scheduled for November 18, 2015. Reopelle filed a motion to exclude evidence of prior bad acts on November 2, 2015. On November 3, 2015, the State notified the defense that Detective Lear, who had been listed as a witness since the Information was filed, would be used as an expert witness to generally describe how financial scams on the internet occur. Reopelle objected on the basis that the State's disclosure of Detective Lear as an expert witness was late. At a pretrial hearing on November 16, 2015, the District Court heard oral argument on Reopelle's motion to exclude prior bad acts evidence and her objection to the disclosure

6

of Detective Lear as an expert witness. At the conclusion of the hearing, the District Court determined that evidence of Reopelle's four prior investigations and two misdemeanor convictions was admissible. The District Court also held that Detective Lear could testify generally as an expert about fraudulent internet financial schemes, but that Detective Lear could not testify as to Reopelle's state of mind. The court indicated it would consider a renewed objection should the testimony stray from what the court had determined was permissible.

¶13    During the settling of jury instructions, Reopelle offered a lesser included offense instruction for misdemeanor theft, i.e. exerting unauthorized control over property valued at less than $1,500. The District Court determined the value of the property MFCU was deprived of was not in dispute and that it exceeded $1,500. The court explained that Reopelle admitted she withdrew $17,800 from MFCU and that the evidence did not support a misdemeanor theft instruction to the jury. Reopelle was found guilty of felony deceptive practices and the court deferred imposition of sentence for a period of six years.

¶14    Following trial, the District Court issued a written opinion and order on November 20, 2015, explaining its decision to allow evidence of prior bad acts. The court noted the similarity of the acts and that Reopelle presented herself as a "sympathetic unwitting lonely victim with limited knowledge as demonstrated by the fact that investigating police officers repeatedly gave her the benefit of the doubt and warnings in multiple earlier similar episodes." The court explained that the prior bad acts evidence was relevant because it had "a tendency to prove that the Defendant did in fact commit the

offense of Deceptive Practices in an ongoing and repeated fashion and did so with knowledge and in the absence of mistake."

¶15 Reopelle raises the aforementioned issues on appeal.

## STANDARDS OF REVIEW

¶16 District courts have broad discretion to determine the admissibility of evidence. *State v. Madplume*, 2017 MT 40, ¶ 19, 386 Mont. 368, 390 P.3d 142. We review evidentiary rulings for an abuse of discretion. *Madplume*, ¶ 19. To the extent an evidentiary ruling is based on a district court's interpretation of the Montana Rules of Evidence, our review is de novo. *Madplume*, ¶ 19.

¶17 This Court reviews a trial court's decision of whether to preclude a witness from testifying for an abuse of discretion. *State v. Bowen*, 2015 MT 246, ¶ 20, 380 Mont. 433, 356 P.3d 449.

¶18 This Court reviews a district court's broad discretion to instruct a jury for an abuse of discretion. *State v. Reynolds*, 2017 MT 25, ¶ 36, 386 Mont. 267, 389 P.3d 243. The district court's decisions regarding instructions to the jury are presumed correct, and the appellant bears the burden of proving they are in error. *Reynolds*, ¶ 36.

¶19 An abuse of discretion occurs when a district court acts arbitrarily without conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *Madplume*, ¶ 19; *Reynolds*, ¶ 36.

## DISCUSSION

¶20    *1. Whether the court abused its discretion by admitting evidence of Reopelle's prior investigations and convictions for fraudulent deceptive practices.*

¶21    Reopelle argues that the court abused its discretion by admitting evidence of Reopelle's prior acts because the evidence did not show that Reopelle knew she acted fraudulently or deceptively; the State did not conduct an adequate investigation into the prior acts to demonstrate Reopelle knew she was behaving fraudulently or deceptively; and the officers' testimony that they had counseled Reopelle on the criminality of her conduct was speculative. Reopelle argues generally that her "purported knowledge of the law is irrelevant." The State maintains that Reopelle's history of victimization was germane to the defense's theory at trial. The State argues that Reopelle's convictions and her repeated investigations into online financial activities, in addition to education by police about criminal activity, were probative of knowledge, intent, and the absence of mistake.

¶22    Unless otherwise provided by constitution, statute, or rule, all relevant evidence is admissible. M. R. Evid. 402. Relevant evidence means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M. R. Evid. 401. Even relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." M. R. Evid. 403. M. R. Evid. 404(b) further limits admissibility:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It

9

may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

¶23 Rule 404(b) does not forbid the admission of propensity evidence or constitute a bar to propensity evidence; instead, Rule 404(b) prohibits a *theory* of admissibility which allows an ultimate inference to be made when it is premised upon an intermediate inference of the defendant's personal, subjective character. *State v. District Court of the Eighteenth Judicial District*, 2010 MT 263, ¶ 47, 358 Mont. 325, 246 P.3d 415. Referring to Edward J. Imwinkelried, *Uncharged Misconduct Evidence*, we explained in *Eighteenth Judicial* that "[e]ssentially, Rule 404(b) disallows the inference from bad act to bad person to guilty person." *Eighteenth Judicial*, ¶ 47. Imwinkelried further explains that if the prosecutor "can arrive at an ultimate inference of conduct through a different intermediate inference, the prohibition is inapplicable." 1 Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 4:1, 5-6 (Rev. ed. 2009) ("When the prosecutor develops a theory of logical relevance without an intermediate inference as to the defendant's character, the theory moots one of the dangers. If the prosecutor can develop an alternative intermediate inference, Rule 404(b) will not bar the admission of uncharged misconduct."). When the theory of admissibility depends on an intermediate inference of a defendant's personal, subjective character traits, there is a high risk of misdecision and that the jury will convict because they find the defendant repulsive, immoral, or repugnant. Imwinkelried, *supra*, at § 4:1, 17. *See also State v. Daffin*, 2017 MT 76, ¶ 15, 387 Mont. 154, 392 P.3d 150 ("Rule 404(b) other acts evidence is admissible if the proponent can 'clearly articulate how that evidence fits into a chain of

10

logical inferences, no link of which may be the inference that the defendant has the propensity to commit the crime charged." (citations omitted)).

¶24 Lastly, Rule 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." In a criminal prosecution, most of the evidence will be prejudicial to the defendant. *State v. Stewart*, 2012 MT 317, ¶ 68, 367 Mont. 503, 291 P.3d 1187 (citing *State v. Belanus*, 2010 MT 204, ¶ 14, 357 Mont. 463, 240 P.3d 1021). Thus, "unfair" prejudice refers to the degree the jury might impermissibly rely on the intermediate inference of propensity. "Even if evidence is potentially unfairly prejudicial, the Rule 403 balancing test favors admission—the risk of unfair prejudice must substantially outweigh the evidence's probative value." *Madplume*, ¶ 33.

¶25 We have stated that "[t]he typical prosecution case is reducible to three elements: (1) someone committed the *actus reus* (i.e. forbidden act) alleged in the indictment or information; (2) that person possessed the requisite *mens rea* (i.e., criminal intent or state of mind); and (3) that person was the defendant." *Stewart*, ¶ 64 (citations omitted). Here, there is no dispute that MFCU was deprived of $17,800 as a result of three cash withdrawals made by Reopelle following the dishonoring of several deposits drawn on a closed account with Academy Bank. Thus, the *actus reus*, or commission of the forbidden act, is not in dispute. Similarly, it is undisputed that Reopelle was the person responsible for making the withdrawals on the deposits. Accordingly, Reopelle's *mens rea*, or intent, was the primary element in dispute in this prosecution.

11

¶26 These proceedings present the quintessential permissible use of prior bad acts evidence. We cannot imagine a clearer example of evidence offered to demonstrate mental state that does *not* rely upon an intermediate inference of Reopelle's personal, subjective character. Here, the prior investigations and convictions were highly probative of Reopelle's intent, knowledge, and absence of mistake—without the necessity of making an intermediate inference of propensity to establish its admissibility. The evidence demonstrated a pattern and course of conduct, as noted by the court, of presenting "worthless bank drafts upon an account that was closed . . . before the worthless nature of the deposited drafts was discovered." In some instances, the worthless bank drafts were offered with instructions that the amount in excess of a purchase price be immediately forwarded back to Reopelle or Reopelle's designee. In other instances, Reopelle claimed she was "duped," "victimized," and innocently following instructions of her internet suitor when accepting checks or money orders and redistributing the monies.

¶27 This evidence is clearly consequential to a determination of an element of the crime: whether Reopelle possessed the *mens rea*, or intent, for the crime charged, theft by *deceptive* practices. Section 45-2-101(18), MCA, provides that "[d]eception means knowingly to . . . create or confirm in another an impression that is false and that the offender does not believe to be true; [or] fail to correct a false impression that the offender previously has created or confirmed . . . ." The repeated and similar circumstances evidencing Reopelle's involvement in online financial schemes where she accepted checks or money orders from people she did not know with instructions to

redistribute the monies is probative of whether Reopelle had the intent to deceive. Furthermore, the appropriate use of evidence demonstrating absence of mistake or accident is premised upon the inference that as the number of incidents increase, the objective probability of accident decreases. That is, it is highly unlikely that the same crime would again be accidentally committed after so many similar prior accidental acts. The permissible inference arising from an absence of mistake or accident allowed by Rule 404(b) is that it defies common sense or logic to find coincidence on so many occasions. Here, the evidence was also probative of Reopelle's intent by demonstrating the unlikelihood of mistake or accident on so many occasions.

¶28 Finally, the testimony that officers educated Reopelle about the types of schemes she was involved in is also probative of Reopelle's knowledge, intent, and absence of mistake. Whether, in fact, the officers actually educated Reopelle about internet scams was for the jury to assess, not the court. We stated in *Eighteenth Judicial*, ¶ 55, that "evidence is not inadmissible just because [the defense] believes the witnesses are not credible." Reopelle's claim, therefore, that the evidence was speculative is not relevant to a Rule 404(b) analysis; such issues go to the weight of the evidence and are for the jury to assess. The defense was free to cross-examine the officers regarding their attempts to educate Reopelle. Still, the fact that law enforcement would inquire of Reopelle five times in six years regarding her suspected fraudulent internet conduct would certainly permit the jury to infer that Reopelle knew her behavior was criminal.

¶29 We conclude that the evidence of Reopelle's involvement in investigations and her convictions for deceptive practices were relevant to knowledge, intent, and absence of

13

mistake. M. R. Evid. 401. The State's theory of admissibility was not premised upon any inference of bad character. M. R. Evid. 404(b). Finally, pursuant to Rule 403, evidence of the prior investigations and convictions was highly probative, in comparison to the minimal risk of any *unfair* prejudice, i.e., use of the evidence by the jury to infer propensity. The District Court did not abuse its discretion and applied the law correctly when it denied Reopelle's motion to exclude evidence of her prior investigations and convictions.[1]

¶30 *2. Whether the court abused its discretion in allowing an expert witness to testify over Reopelle's objection that the State's notification was late.*

¶31 Reopelle's objection to Detective Lear testifying is based entirely on her claim that the State's disclosure of Detective Lear as an expert witness was late. Defense counsel argued that such a "late disclosure" precluded her from obtaining her own expert witness who could indicate the current offense was consistent with being a victim of an internet scam. Reopelle did not want a continuance, however, arguing that she would have to waive her right to speedy trial.

¶32 Detective Lear had been noticed by the State as a witness since the Information was filed. The District Court observed that Detective Lear would provide general information about online fraudulent schemes and that such a general description of criminal activity is no more "exotic than most other police work." The court disallowed

---

[1] We reject Reopelle's suggestion that our analysis should include review of the thoroughness of the investigation conducted by law enforcement in the four prior investigations. To the extent this may have any relevance, it would relate to the weight or credibility a jury might attribute to the evidence. Certainly as well, a court may consider excluding the prior bad acts evidence because of the risk that the jury may be led astray or confused by a mini-trial. That is not Reopelle's argument, however, either here or in the District Court.

14

any testimony by Detective Lear concerning Reopelle's state of mind and recognized that if the testimony strayed during trial, that Reopelle could renew her objection to a specific inquiry.

¶33 Based upon our review of the record, it is clear the defense was aware that Detective Lear would testify and that she had firsthand information about many of the investigations that Reopelle had been involved in. The defense similarly knew that Detective Lear had explained to Reopelle how online fraudulent financial schemes generally work and to avoid becoming involved in such criminal activity. As of November 16, 2015, defense counsel had not interviewed Detective Lear, although the State had made her available as an expert witness since April 10, 2015. Significantly, the information Detective Lear would offer as an expert witness was nothing different from the information she possessed and was available to relate to the defense when she was first identified as a witness in the Information. Reopelle made no showing of any attempt to secure an expert or how the expert would rebut Detective Lear's testimony. Indeed, Detective Lear's decisions not to charge Reopelle in the earlier investigation and to educate Reopelle regarding internet activities were consistent with Reopelle's argument that her expert would help establish that Reopelle was a victim of the scam and had been "duped."

¶34 We conclude that the District Court's decision to overrule Reopelle's objection based on Detective Lear's late disclosure was not an abuse of discretion. Our conclusion is premised upon the nature of Detective Lear's involvement in the prior investigations; that Detective Lear's actions and expected testimony were known and did not constitute a

surprise to the defense; that the record is silent concerning how a "competing" expert would rebut Detective Lear's testimony; and that Reopelle rejected the notion of a continuance.

¶35 *3. Whether the court abused its discretion when it declined to give a proposed jury instruction for misdemeanor theft.*

¶36 Reopelle argues that she was entitled to a lesser included offense instruction of misdemeanor theft because Reopelle kept for herself an amount less than $1,500. Reopelle maintains that the rest of the money went into "Shawn Garvin's" Wells Fargo account and therefore should not be used in computing value to satisfy the elements of felony theft. Reopelle did not request a lesser included offense instruction for felony deceptive practices. However, the jury returned a verdict of guilty of felony deceptive practices and rejected the alternative charge of theft, regardless of whether a misdemeanor theft instruction was given. *See State v. Stewart*, 2016 MT 1, ¶ 25, 382 Mont. 57, 363 P.3d 1140 (concluding there was no error to refuse misdemeanor assault instruction when the jury rejected a lesser charge of attempted aggravated assault in favor of attempted deliberate homicide).

¶37 More importantly, however, the District Court correctly declined to instruct the jury on misdemeanor theft because it was undisputed the value of the property MFCU was deprived of was greater than $1,500. It was undisputed that Reopelle made three cash withdrawals totaling $17,800 and that the checks were not honored by the issuing bank. Accordingly, the evidence did not support a finding that Reopelle committed the

lesser offense. *See State v. Russell*, 2016 MT 268, ¶¶ 22-25, 385 Mont. 208, 383 P.3d 198.

¶38 The District Court correctly recognized that the evidence did not support a lesser included theft instruction.

## CONCLUSION

¶39 Reopelle's conviction is affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR

Justice Jim Rice, concurring.

¶40 Citing to legal commentators can be helpful if our law is not sufficiently developed or we lack precedent necessary to guide our decision. However, caution must be employed, as commentators often speak generally and fail to incorporate the nuances of a particular state's law. Regarding Rule 404(b), we have significant Montana jurisprudence that is clearly sufficient to decide this case, and the Court's multiple citations to legal commentary are unnecessary. The opinion's author relied heavily upon this commentary in her recent dissent in *State v. Blaz*, 2017 MT 164, 388 Mont. 105, ___ P.3d ___, which was decided without reliance on the commentary. My vote to affirm is based on the authority of Montana case law.

/S/ JIM RICE