FILED

05/19/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0488

DA 23-0488

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 106

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

MICHAEL TODD SMITH,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Ninth Judicial District,
In and For the County of Teton, Cause No. DC-17-010
Honorable Gregory L. Bonilla, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Gregory E. Paskell, Attorney at Law, Lynwood, Washington

      For Appellee:

          Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant Attorney General, Helena, Montana

          Joe Coble, Teton County Attorney, Jennifer Stutz, Deputy Teton County Attorney, Choteau, Montana

Submitted on Briefs:  May 6, 2026

Decided:  May 19, 2026

Filed:

_____
Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1 In the Montana Ninth Judicial District Court, Teton County, Appellant Michael Todd Smith was found guilty of five counts of Sexual Abuse of Children in violation of § 45-5-625(1)(e), MCA. Smith appeals the District Court's Order denying his motion to dismiss for lack of a speedy trial, the Order denying his motion to compel, the admissibility of certain trial exhibits, and the Judgment entering the convictions. We restate and address the following issues:

> Issue 1: Whether Smith's right to a speedy trial was violated.
>
> Issue 2: Whether the District Court abused its discretion by denying Smith's motion to compel.
>
> Issue 3: Whether the District Court abused its discretion under M. R. Evid. 403 by admitting certain exhibits during trial.

¶2 We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On January 9, 2015, Teton County Sheriff Deputy Mark Groves, other deputies of the Teton County Sheriff's Office, and Probation Officer Cody Shaw performed a home check at Smith's residence for Smith's brother, Lance Smith (Lance). Lance was participating in drug court at the time due to a felony drug distribution charge, and Shaw suspected that Lance had violated the conditions of participation. Lance, his wife, and his stepdaughter had lived at Smith's residence since November 2014. During the search of Smith's residence, law enforcement confiscated marijuana and items related to growing marijuana. Law enforcement also confiscated a grey laptop and red laptop from Smith's

2

bedroom. Smith pled guilty to a charge of Criminal Endangerment, and was sentenced in July 2015 to a four-year commitment to the Department of Corrections (DOC), with all time suspended.[1] Lance was incarcerated for a drug distribution charge.

¶4     The laptops seized in the search were forfeited and the Teton County Sheriff's Office retained both of them. In June 2016, Deputy Groves requested Special Agent Brent Johnsrud of the Department of Homeland Security to analyze the laptops' content before the Sheriff's Office used them as office resources because Deputy Groves suspected that they may contain illegal content. Upon receiving the laptops, Johnsrud used forensic technology to copy the data from the laptops' hard drives to a government-owned hard drive ("cloned hard drive"), made a copy of the cloned hard drive ("working hard drive"), and verified through forensic imaging software that both the cloned hard drive and working hard drive contained the same data as the original hard drives. Agent Johnsrud mailed the laptops with their original hard drives to the Teton County Sheriff's Office with instructions to not power on the laptops as powering on the laptops would result in the laptops' computer system automatically altering the hard drives' data. Agent Johnsrud retained the working and cloned hard drives.

¶5     Agent Johnsrud forensically analyzed the working hard drive and completed a report on his findings on February 28, 2017. Johnsrud's report concluded the grey laptop's single user account had downloaded thousands of child pornography images and 16 child

---

[1] The criminal endangerment charge was based on Smith's step-niece having access to the marijuana that was left laying around his house.

pornography videos. The report included a findings disc that contained 500 suspected illegal images and videos that Johnsrud determined were downloaded between September 2013 and January 8, 2015. The findings disc did not include the suspected illegal content that was found on the red laptop because the data could not be associated with a certain user or timeframe given that it was located in the hard drive's unallocated space. The Teton County Sheriff's Office initiated an investigation based on Johnsrud's report.

¶6     On April 24, 2017, the State charged Smith with two counts of Sexual Abuse of Children based on knowingly distributing and/or possessing child pornography through peer-to-peer programs.[2] The District Court issued an arrest warrant the following day. The Teton County Sherriff's Office attempted to serve the warrant on Smith with the help of Smith's probation officer to no avail. On April 26, 2017, Smith's probation officer attempted a home check and asked Smith to make himself available to the officer without success. In May 2017, the State filed a petition for revocation of Smith's suspended sentence based on Smith absconding from supervision, ceasing communication with his probation officer, and failing a urinalysis test. The District Court issued an arrest warrant for Smith based on the petition for revocation.

¶7     Smith's whereabouts remained unknown until Smith was arrested in Mexico over four years later, on June 15, 2021. Smith was deported to Texas and two days later, on June 17, 2021, Smith was served with both arrest warrants and extradited to Montana.

---

[2] Ten days before trial, the State filed an Amended Information, charging Smith with three additional counts of Sexual Abuse of Children based on knowingly distributing and/or possessing child pornography through peer-to-peer programs.

Smith initially appeared before the District Court on June 30, 2021, and the District Court revoked his suspended sentence on July 7, 2021, and sentenced him to three years DOC with no time suspended. On July 29, 2021, the District Court arraigned Smith on the pending child sexual abuse charges, to which he pled not guilty. The District Court released Smith on his own recognizance on the pending charges, and the DOC took custody of Smith.

¶8 The District Court initially set trial for February 22, 2022. The District Court granted the State's motion to continue the trial, over Smith's objection, based on ongoing plea negotiations and rescheduled trial for May 9, 2022. The District Court granted Smith's April 2022 motion to continue the trial because Smith's counsel was unavailable. The District Court rescheduled the trial for August 15, 2022.

¶9 Smith's counsel contacted the Teton County Attorney's Office to arrange a time to search the laptops' hard drives to determine who was using the laptops. On April 21, 2022, the Teton County Sheriff's Office permitted Smith's counsel to view the incriminating files on the findings disc, but Smith's counsel was not permitted to power on the laptops to search the original hard drives' files. Smith's counsel was informed that Johnsrud was re-analyzing the working hard drive for information that indicated who used the grey laptop, including using the search term "Lance Smith." Smith's counsel received Johnsrud's supplemental report that concluded the grey laptop contained files that indicated Smith was the user of the grey laptop. Johnsrud reported that he did not find any files associated with Lance on the grey laptop.

¶10 Smith's counsel contacted Johnsrud on July 7, 2022, to gain access to the original laptops and hard drives. On July 11, 2022, Johnsrud responded that Smith's counsel could physically inspect the original laptops and hard drives but that he could not power them on to review their files. Smith's counsel declined the opportunity provided by Agent Johnsrud to analyze a working hard drive within the office of a law enforcement agency or prosecutor. Smith filed a motion to compel on July 26, 2022, requesting the District Court to order the State to allow his counsel to power on the laptops to review their files under the supervision of law enforcement.

¶11 On August 1, 2022, the District Court rescheduled trial for October 11, 2022, upon the State's motion, without opposition from Smith, due to the sweltering courtroom temperatures caused by a defunct air cooling system. At a September 6, 2022 status hearing, the parties discussed the status of Smith's motion to compel. The District Court permitted the State to file a response to Smith's motion to compel by September 30, 2022, without objection from Smith. Upon the State's request, the District Court ordered oral argument on Smith's motion and rescheduled trial for January 17, 2023.

¶12 The District Court held a hearing on Smith's motion to compel on November 1, 2022. Johnsrud was unavailable to testify at the hearing initially set for October 18, 2022. Johnsrud testified to how he created the cloned hard drive and working hard drive, verified their accuracy, and the importance of not powering on the original laptops. Johnsrud testified to the protocol Smith's counsel could have used to analyze a working hard drive. Smith's counsel insinuated that Johnsrud's supplemental report was inaccurate and that the

data on the cloned and working hard drives was altered but did not present any supporting evidence to that effect. On November 15, 2022, the District Court denied Smtih's motion.

¶13 On December 14, 2022, Smith filed a motion to dismiss for lack of a speedy trial. On January 3, 2023, the District Court held a hearing on Smith's motion at which Smith testified to a medical condition that began when he was incarcerated in Mexico, mental health troubles, the medical treatment that he had received while incarcerated in Montana, and how the pretrial delay had impacted his marriage, finances, and DOC placement. Upon Smith's request, the District Court permitted Smith to file a reply brief and supplement the record despite the District Court informing Smith that this could postpone the trial set for January 17, 2023. After the hearing, the District Court rescheduled the trial to March 13, 2023, due to the limited time it would have to rule upon Smith's motion. On January 18, 2023, the District Court denied Smith's motion to dismiss.

¶14 Trial began on March 13, 2023. Deputy Groves, Shaw, and Lance testified to Lance's involvement with the criminal justice system due to his relationship with drugs and that law enforcement searched Smith's residence due to Lance's participation in drug court. Deputy Groves testified to searching Smith's residence, confiscating both laptops from Smith's bedroom, recording them in a search warrant inventory, and describing the purpose of the search warrant inventory. The District Court admitted the search warrant inventory as an exhibit over Smith's M. R. Evid. 403 and M. R. Evid. 404(b) objection. Johnsrud testified to how he located the files containing illegal content, where he found those files, and what files indicated that Smith was the user of the grey laptop. The District

Court admitted a screenshot of the grey laptop's desktop screen as an exhibit over Smith's Rule 403 objection. Lance and Smith each testified that they had no knowledge of the grey laptop's contents and testified that the other person was the culpable party.

## STANDARDS OF REVIEW

¶15 "We apply two standards of review when reviewing a trial court's ruling on a speedy trial motion." *State v. Burnett*, 2022 MT 10, ¶ 14, 407 Mont. 189, 502 P.3d 703 (citation omitted). We review the district court's factual findings to determine whether they are clearly erroneous. *City of Helena v. Heppner*, 2015 MT 15, ¶ 10, 378 Mont. 68, 341 P.3d 640 (citation omitted). The district court's ruling on whether the defendant's right to a speedy trial was violated presents a constitutional question that we review de novo. *Burnett*, ¶ 14 (citation omitted).

¶16 We review a district court's evidentiary rulings for an abuse of discretion to the extent the ruling does not involve an interpretation or conclusion of law. *State v. Colburn*, 2018 MT 141, ¶ 7, 391 Mont. 449, 419 P.3d 1196 (citation omitted). "We review orders granting or denying requests for discovery for an abuse of discretion." *State v. Peters*, 2011 MT 274, ¶ 22, 362 Mont. 389, 264 P.3d 1124 (citation omitted). A district court abuses its discretion when it "act[s] arbitrarily without conscientious judgment or exceed[s] the bounds of reason." *Colburn*, ¶ 7.

## DISCUSSION

¶17 *Issue 1: Whether Smith's right to a speedy trial was violated.*

¶18 A criminal defendant has a fundamental constitutional right to a speedy trial under the Sixth and Fourteenth Amendments to the United States Constitution and Article II, Section 24 of the Montana Constitution. *Burnett*, ¶ 17 (citation omitted). We examine alleged speedy trial violations under a four-factor test that balances (1) the length of delay, (2) the reasons for the delay, (3) the accused's responses to the delay, and (4) the prejudice to the accused. *State v. Snider*, 2018 MT 258, ¶ 13, 393 Mont. 166, 429 P.3d 268 (citing *State v. Ariegwe*, 2007 MT 204, ¶ 34, 338 Mont. 442, 167 P.3d 815). "No one factor is dispositive; the factors are related and must be assessed together with other relevant circumstances." *Burnett*, ¶ 17 (citing *Ariegwe*, ¶ 112).

**Factor One: Length of the Delay**

¶19 The delay between the accusation and trial must exceed 200 days to trigger a speedy trial analysis. *Snider*, ¶ 13 (citation omitted). We still consider "how far the delay surpassed that [200-day] threshold, because the presumption of prejudice intensifies and the State's burden to justify the delay increases as the delay grows longer." *Snider*, ¶ 14 (citing *Ariegwe*, ¶ 62). There is no dispute this case warranted a speedy trial analysis because Smith and the State agree that 2,093 days elapsed between the filing of the Information and the trial set for January 17, 2023.[3]

**Factor Two: Reasons for the Delay**

¶20 Under the second factor, we identify "each period of delay in bringing the accused to trial," "assign the delay to the responsible party," and assign weight to each delay based

---

[3] The delay amounts to 2,162 days as a 69-day delay occurred after the hearing on Smith's motion to dismiss.

on the specific cause and culpability for the delay. *Burnett*, ¶ 21 (citations omitted). "Since the State bears the duty to timely bring a defendant to trial, delay is charged to the State unless the defendant caused the delay or affirmatively waived the speedy trial right for the period of time in question." *State v. Stops*, 2013 MT 131, ¶ 27, 370 Mont. 226, 301 P.3d 811 (citations omitted). Institutional delays are those inherent in the criminal justice system or caused by circumstances largely beyond the State's or accused's control and weigh against the State but weigh less heavily than delay caused by bad faith, negligence, or lack of diligence. *Burnett*, ¶ 22 (citation omitted). Similarly, delays for valid reasons, such as the unavailability of a key witness or requesting additional time to prepare for trial, are weighed less heavily against the culpable party than delay caused by a lack of diligence or bad faith. *Stops*, ¶ 27 (citations omitted).

¶21 The District Court identified seven periods of delay that had occurred at the time Smith filed the motion to dismiss, totaling 2,093 days. The District Court attributed 481 days of delay to the State, deeming 133 days as "deliberate delay" and the remaining 348 days as institutional delay. The District Court attributed 1,612 days to Smith and deemed them all deliberate. The District Court weighed the second factor in favor of the State as it concluded Smith's own conduct contributed "significantly to the delay" whereas the delay it attributed to the State was largely institutional.

¶22 Our analysis focuses on two periods of delay as Smith and the State primarily dispute whether the District Court properly attributed to Smith the 1,514-day delay between

the filing of the Information and Smith's arrest and properly attributed to the State the 98-day delay associated with Smith's motion to compel.

*Information to arrest*

¶23    The District Court attributed the 1,514-day delay between the filing of the Information and Smith's arrest to Smith because it determined that Smith absconded from probation and that the Teton County Sheriff's Office diligently tried to acquire jurisdiction over Smith by obtaining an arrest warrant, attempting to serve the warrant on Smith with the help of Smith's probation officer, and quickly extradited Smith after he was returned to the United States.

¶24    Smith argues the District Court should have attributed this delay to the State because the Teton County Sheriff's Office failed to attempt to locate Smith and the record does not show that he absconded to avoid the pending child sexual abuse charges.  The State reiterates the District Court's reasoning to argue the delay was properly attributed to Smith.

¶25    It is undoubtedly the State's obligation to bring the accused to trial, which includes the State making a good faith effort to obtain jurisdiction over the accused.  *State v. Lacey*, 2010 MT 6, ¶ 17, 355 Mont. 31, 224 P.3d 1247 (citing *State v. Longhorn*, 2002 MT 135, ¶ 22, 310 Mont. 172, 49 P.3d 48, *overruled on other grounds by Giambra v. Kelsey*, 2007 MT 158, 338 Mont. 19, 162 P.3d 134).  Nonetheless, "if the accused avoids being brought to trial, some or all of the resulting delay should be attributed to the accused."  *State v. Houghton*, 2010 MT 145, ¶ 23, 357 Mont. 9, 234 P.3d 904 (citing *Lacey*, ¶ 18).  "'A defendant who chooses to keep himself deliberately ignorant of the proceedings, or who

11

has knowledge of the proceedings and is voluntarily absent, should expect that the resulting delay in locating him and bringing him back to court may be attributed to him.'" *State v. Eystad*, 2017 MT 29, ¶ 16, 386 Mont. 291, 389 P.3d 1014 (quoting *State v. Hodge*, 2014 MT 308, ¶ 20, 377 Mont. 123, 339 P.3d 8).

¶26 Smith unquestionably knew he was under supervision for the Criminal Endangerment charge to which he pled guilty in July 2015, he absconded from supervision, and, at a minimum, his act of absconding kept him ignorant of the pending child sexual abuse charges. The conditions of Smith's suspended sentence required him to make his residence open to home visits, contact his supervising officer on a monthly basis, and receive permission before establishing a residence, changing residences, or leaving his assigned district. Smith violated the conditions of the suspended sentence by misreporting his last known residence, failing to make himself available to the probation officer upon the officer's request, and failing to communicate with the probation officer on a monthly basis. Had Smith complied with the conditions of the suspended sentence, Smith would have been served the arrest warrant in April 2017. The fact that Smith voluntarily disregarded the reporting requirements of his suspended sentence and absconded supports attributing the delay to Smith because he was aware of his obligations under his suspended sentence and absconded. *E.g.*, *Eystad*, ¶¶ 16-17; *State v. Reynolds*, 2017 MT 25, ¶ 21, 386 Mont. 267, 389 P.3d 243; *see also Houghton*, ¶ 24; *Lacey*, ¶ 19.

¶27 Smith relies on *United States v. Brown*, 169 F.3d 344 (6th Cir. 1999) to contend the delay cannot be attributed to him because he did not know about the pending charges when

he absconded. Smith's reliance on *Brown* is misplaced. In *Brown*, the Sixth Circuit determined the accused was not responsible for the delay between the indictment and arrest because the government failed to present credible evidence that established Brown was aware of the indictment and intentionally hid to avoid prosecution. *Brown*, 169 F.3d at 349-50. Reasonable diligence under the circumstances in *Brown* would have started with the government requesting Brown's attorney to notify Brown of the indictment and bring Brown in for arraignment pursuant to an agreement between the government and Brown's attorney. *Brown*, 169 F.3d at 346, 350. But there was no indication that an agreement or other circumstance obligated Brown to maintain contact with his attorney or the United States government during the delay. *See Brown*, 169 F.3d at 346-47. Smith's culpability for causing the delay substantially differs from the accused in *Brown* as Smith's suspended sentence obligated him to report his whereabouts to his probation officer, make himself available to the officer upon request, and maintain contact with the officer.

¶28 Smith also asserts the Teton County Sheriff's Office did not diligently try to obtain jurisdiction of him because it failed to take the measures that we described in *Lacey*, *Houghton*, and *Longhorn*. Law enforcements' efforts in *Lacey*, *Houghton*, and *Longhorn* included contacting the local law enforcement agency of the accused's "last known address," obtaining an arrest warrant and filing it in the National Criminal Information Center (NCIC) database, seeking assistance from out-of-state law enforcement, placing advertisements in newspapers, and extraditing the accused. *Longhorn*, ¶¶ 12-14, 30-31; *Lacey*, ¶¶ 6, 8-9, 18-19; *Houghton*, ¶¶ 4-5, 25.

¶29 The most analogous case is *Lacey* in which Lacey caused a delay of 3,137 days between the issuance of the arrest warrant and his arrest by absconding to Mexico once he felt that charges were going to be filed. *Lacey*, ¶¶ 6, 15. In *Lacey*, law enforcement could not locate Lacey for questioning, subsequently filed an information, and tried to locate Lacey. *Lacey*, ¶ 6. Law enforcement obtained a warrant and extradition request, entered the warrant and extradition request in the NCIC database, and met with Lacey's family members shortly after the information was filed. *Lacey*, ¶¶ 6, 19. Lacey was eventually apprehended in Arizona and extradited to Montana. *Lacey*, ¶¶ 8-9. This Court stated that law enforcement could have been more diligent in obtaining jurisdiction over Lacey by contacting the United States Border Patrol because Lacey's family members had told them that Lacey may be moving between Mexico and the United States. *Lacey*, ¶¶ 6, 19. The Court still concluded the district court properly attributed the delay to Lacey because Lacey knew of the allegations that led to the charges, absconded to avoid the charges, and his actions over the 3,137-day delay indicated that he intentionally hid from law enforcement. *See Lacey*, ¶ 19.

¶30 The record indicates that the Teton County Sheriff's Office made similar efforts to obtain jurisdiction over Smith. The Teton County Sheriff's Office obtained an arrest warrant for Smith one day after filing the charges and contacted Smith's probation officer to assist with serving the arrest warrant. The probation officer attempted to locate Smith at his last reported residence and requested Smith to make himself available to the officer on April 26, 2017. The Teton County Sheriff's Office had no information on Smith's

location as the probation officer could not locate Smith's last reported residence, Smith failed to keep his probation officer apprised of his address, as he was required to do, Smith did not make himself available to his probation officer upon request, and Smith ceased communicating with the officer after April 26, 2017. But as soon as Smith was located in Mexico and deported to Texas on June 15, 2021, the Teton County Sheriff's Office had him served with the arrest warrant just two days later, on June 17, 2021. Smith was extradited from Texas and initially appeared on June 30, 2021.

¶31 The Teton County Sheriff's Office could have made additional efforts to locate Smith, but the record as a whole supports that the District Court properly attributed the delay to Smith. *See Lacey*, ¶ 19 (concluding "that on balance, the evidence supports . . . attribut[ing] [the delay] to [the accused]"). The Teton County Sheriff's Office tried to apprehend Smith once the charges were filed and quickly acquired jurisdiction over Smith once his location was known. Smith avoided the pending charges by failing to comply with the conditions of the suspended sentence, including the reporting requirements, failing to make himself available upon request, and failing to maintain contact with his probation officer. Smith's actions of relocating to a jurisdiction not only outside of Montana, but outside the United States, and ceasing communication with his probation officer demonstrates Smith sought to avoid law enforcement and the criminal justice system. The District Court did not err in attributing to Smith the delay between the filing of the Information and Smith's arrest.

15

*Time between the fourth and fifth trial setting*

¶32    The District Court attributed the 98-day delay between the October 11, 2022 trial date and the January 17, 2023 trial date associated with Smith's motion to compel to the State as institutional delay.  The State conceded in its brief opposing Smith's motion to dismiss that the delay should be attributed to the State as institutional delay.  The State now argues on appeal that the delay should be attributed to Smith because Smith's counsel allegedly failed to serve the motion on the State.  The record does not support the State's assertion as Smith filed a certificate of service attesting to serving the State by email on July 26, 2022.  The discussion between the State, Smith's counsel, and the District Court at the September 6, 2022 status hearing indicates that the State did not know of Smith's motion until Smith addressed it at the status hearing.  The record does not demonstrate that Smith failed to serve the State or that the State negligently failed to respond to Smith's motion.  The District Court did not err in attributing this delay to the State as institutional delay.

¶33    Smith makes a sweeping argument, without articulating any substantive legal analysis, that the District Court should have weighed the institutional delay it attributed to the State more heavily against the State.  Smith only contends that the 69-day delay that occurred between the hearing on Smith's motion to dismiss and the March 13, 2023 trial should be weighed more heavily against the State because Smith filed the "motion well outside the [ten]-day mandatory assessment described in *Ariegwe*."

¶34　Our decision in *Ariegwe* established that trial courts should attribute to the accused the delay resulting from the accused filing a speedy trial motion less than thirty days prior to a scheduled trial because fully addressing the motion "cannot realistically be accomplished in less than thirty days[.]" *Ariegwe*, ¶¶ 115-16.　The 69-day delay that occurred between the hearing on Smith's speedy trial motion and the March 13, 2023 trial would likely have been assigned to the State as institutional delay as Smith filed the motion more than thirty days prior to the trial set for January 17, 2023.　*See Ariegwe*, ¶ 116. Regardless, Smith does not articulate why the District Court should have weighed the other periods of institutional delay *more heavily* against the State and we do not address unarticulated arguments.　*Herman v. State*, 2006 MT 7, ¶ 22, 330 Mont. 267, 127 P.3d 422 (citation omitted).

¶35　The District Court did not err in weighing the reasons for the delay against Smith as Smith caused over two-thirds of the pretrial delay by absconding from supervision whereas the 481 days it attributed to the State was largely institutional delay.

**Factor Three: Accused's Response to the Delay**

¶36　"We consider the totality of an accused's responses to the delay to ascertain if the [accused] 'actually wanted a speedy trial.'" *State v. Sartain*, 2010 MT 213, ¶ 18, 357 Mont. 483, 241 P.3d 1032 (quoting *Ariegwe*, ¶ 79).　The number of times the accused acquiesced or objected to delay is not dispositive and we consider "the timeliness, persistence, and sincerity of the objections, the reasons for the acquiescence, whether the accused was represented by counsel, [and] the accused's pretrial conduct (as that conduct bears on the

speedy trial right)." *Ariegwe*, ¶ 80 (citation omitted). "[W]hether [the accused] actually wanted a speedy trial . . . provides guidance for balancing the other factors." *Burnett*, ¶ 28 (citation omitted). The accused does not establish that the third factor should be weighed in the accused's favor simply by filing a speedy trial motion before trial commences. *Ariegwe*, ¶ 79.

¶37 The District Court concluded that Smith did not want a speedy trial and weighed this against him because he acquiesced in the delay caused by the State's various motions, never objected to any pretrial delay, moved to continue the May 9, 2022 trial date, and contributed to the delay when he absconded from supervision.

¶38 Smith contends the District Court erroneously concluded he did not want a speedy trial because he contends he persistently informed the District Court that he was ready to proceed to trial and that moving to continue the trial based on his counsel's unavailability should not be weighed against him. The State concedes that the District Court erroneously found that Smith never objected to delaying the trial, but it contends that Smith's actions over the course of the case demonstrate that he was not interested in a speedy trial.

¶39 The record supports the District Court's conclusion as Smith either caused or acquiesced in delaying trial despite Smith's counsel's adamant assertions throughout the case that the defense was ready for trial. Smith's willingness to delay the trial after making these assertions is inconsistent with a sincere desire and readiness to try the case. Smith substituted for private counsel prior to the March 2022 status hearing and Smith's counsel represented a readiness for trial at the March 2022 status hearing despite moving to

18

continue the trial in April 2022 based on his unavailability. *Burnett*, ¶¶ 30-31 (accused substituting counsel contributed to the delay). Smith's counsel asserted the defense was ready for trial at the July 2022 status hearing despite knowing he had administrative barriers impeding his ability to view the original laptops' files, which prompted Smith to file the motion to compel twenty days before trial that was scheduled for August 15, 2022. Smith acquiesced in further delay associated with the motion to compel as Smith did not oppose allowing the State to file a response by September 30, 2022, despite that trial had been rescheduled to October 11, 2022. Smith did not file a motion to dismiss for lack of speedy trial until 547 days after his arrest and requested the opportunity to submit a reply brief and supplement the record after the hearing despite that trial was set to begin fourteen days after the hearing. *See State v. Heath*, 2018 MT 318, ¶ 23, 394 Mont. 41, 432 P.3d 141 (weighing factor three against accused when he "failed to assert his speedy trial right until . . . more than a year after proceedings began, he waited until one month before trial to file a motion to dismiss for lack of speedy trial, [and] he did not request a hearing on the motion until thirteen days before trial").

¶40 The District Court did not err by concluding Smith did not desire a speedy trial and weighing this factor against him.

**Factor Four: Prejudice to the Accused**

¶41 We consider whether the pretrial delay prejudiced the accused by considering the interests that the right to a speedy trial protects: (i) to prevent oppressive pretrial incarceration, (ii) minimize the anxiety and concern of the accused, and (iii) to limit the

possibility that the defense will be impaired by dimming memories and loss of exculpatory evidence. *Burnett*, ¶ 32 (citing *Ariegwe*, ¶ 111). As the delay extends "beyond the 200-day trigger point, we require less proof from the defendant showing prejudice and more proof from the State showing a lack thereof." *Stops*, ¶ 41 (citing *Sartain*, ¶ 21; *Ariegwe*, ¶ 49). Regardless of the duration of the pretrial delay, both the accused and the State should provide evidence to establish prejudice or the lack thereof. *Ariegwe*, ¶ 56.

¶42 The District Court determined the pretrial delay prejudiced Smith to an extent "but not enough to tip the scales in his favor" given that Smith's pretrial incarceration resulted from Smith's revoked suspended sentence and that Smith could not show the pretrial delay impaired his defense. Smith contends that the State did not meet its high burden to prove that he did not suffer prejudice due to the significant pretrial delay.

*Oppressive pretrial incarceration*

¶43 "Whether pretrial incarceration was oppressive depends on the circumstances, including the duration of incarceration, the complexity of the charged offense, any misconduct by the accused directly related to his incarceration, and the conditions of incarceration." *Burnett*, ¶ 33 (citation omitted). "Generally, we do not consider pretrial incarceration resulting from previous unrelated felonies to be oppressive." *Snider*, ¶ 20 (citing *State v. Butterfly*, 2016 MT 195, ¶ 38, 384 Mont. 287, 377 P.3d 1191); *State v. Bowser*, 2005 MT 279, ¶ 15, 329 Mont. 218, 123 P.3d 230.

¶44 The District Court found that Smith's pretrial incarceration resulted from his revoked sentence and that Smith received medical treatment on multiple occasions to treat

his pre-existing gastrointestinal ailment, including an endoscopy. Smith argues that his pretrial incarceration was oppressive because the pending charges prevented him from receiving a better DOC placement and because he received inadequate medical treatment.

¶45 The record supports the District Court's findings that Smith's pretrial incarceration resulted from his unrelated revoked sentence. Smith was released on his own recognizance for the pending charges on July 8, 2021, and was subsequently incarcerated pursuant to the revocation of his suspended sentence. Although Smith asserts that the pending charges impacted his ability to receive a more favorable DOC placement, he failed to present any evidence beyond his own speculation to support this assertion despite being given leave to supplement the record on this issue. *Snider*, ¶ 20; *Bowser*, ¶ 15.

¶46 Smith's own testimony supports the District Court's findings that Smith received adequate medical treatment. Smith testified that he attended multiple medical appointments while being housed at Cascade County Detention Center (CCDC) and Broadwater County Detention Center (BCDC). Smith testified that he received an endoscopy while under the care of the BCDC despite having difficulties receiving an endoscopy through CCDC. Smith's testimony indicates that he received adequate mental health care for his anxiety as he began receiving mental health medication in early 2022, the detention centers prescribed him eight to nine different medications due to Smith's sensitivity to certain mental health medications, and Smith consulted with mental health professionals. Smith's argument that he was denied access to additional medical care due to the proximity of his trial dates is also speculative as Smith also failed to supplement the

record with evidence corroborating his testimony despite the District Court permitting him to do so. The District Court's findings that Smith received adequate medical care are not clearly erroneous. *State v. Rose*, 2009 MT 4, ¶ 71, 348 Mont. 291, 202 P.3d 749 (accused received sufficient medical treatment "including medical appointments with a nurse and a physician, as well as treatment with various pain medications and anti-inflammatory drugs").

*Anxiety and concern*

¶47 "The speedy trial guarantee serves to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges . . . not to eliminate the disruption altogether." *Ariegwe*, ¶ 147 (citation and internal quotations omitted). "[T]he primary question remains whether the delay in bringing the defendant to trial unduly prolonged the disruption or aggravated the anxiety and concern inherent in being accused of a crime." *Burnett*, ¶ 36 (citation omitted).

¶48 The District Court concluded that Smith suffered prejudice, but that Smith's pretrial incarceration did not unduly impose a financial hardship upon him because his pretrial incarceration resulted from his revocation sentence. Smith argues on appeal that the pretrial delay disrupted his life by deepening his anxiety, straining his marital relationship, and imposing a financial hardship. The State argues that Smith failed to present the District Court with "any compelling or substantive evidence that [he] suffered undue anxiety or concern."

¶49 Smith testified that he experienced moderate to extreme anxiety while incarcerated. Smith testified that the other inmates' potential violent reactions to him due to the nature of the charges, his pre-existing gastrointestinal condition, and the continuous rescheduling of trial dates worsened his anxiety. Smith also testified that the pretrial incarceration strained his marriage and imposed a financial hardship due to the expenses he incurred to communicate with his spouse who was living in Mexico.

¶50 Smith's testimony indicates that his pre-existing medical condition and the nature of the charges contributed to worsening his anxiety rather than the pretrial delay itself. *State v. Highpine*, 2000 MT 368, ¶¶ 28-30, 303 Mont. 422, 15 P.3d 938 (the accused's anxiety was caused by "the type of crimes with which he was charged" rather than pretrial delay); *see Burnett*, ¶ 38 (the accused's testimony "that many of the conditions existed before the charges undercuts her argument"). The record supports the District Court's determination that the pretrial incarceration did not impose a financial hardship on Smith because he would have been incarcerated due to his revoked sentence regardless of the pending charges. Although the District Court may infer from the evidence that the pretrial delay caused Smith to experience extreme anxiety and strained his marital relationship, Smith's acquiescence in delaying trial on multiple occasions and the lack of an evidentiary connection between these concerns and the pretrial delay beyond Smith's own testimony did not support attributing substantial prejudice to Smith. *Sartain*, ¶ 24; *State v. Mayes*, 2016 MT 305, ¶ 21, 385 Mont. 411, 384 P.3d 102 (attributing "little, if any, prejudice to [the accused]" solely based on his testimony of anxiety and concern).

*Impairment of the defense*

¶51 We consider whether the delay impaired the accused's defense by weakening the accused's ability to "raise specific defenses, elicit specific testimony, or produce specific items of evidence." *Ariegwe*, ¶ 111. "This is the most important consideration in our prejudice analysis." *State v. Daly*, 2023 MT 142, ¶ 33, 413 Mont. 100, 533 P.3d 326 (citation omitted). A lengthy delay shifts the burden towards the State to present more compelling evidence, but it does not entirely relieve the accused from attempting to demonstrate their defense was impaired. *See Ariegwe*, ¶¶ 49, 53, 55.

¶52 The District Court concluded that the pretrial delay did not impair Smith's defense because "[Smith] [was] unable to point to any specific impairment." Smith and the State argue that neither party presented evidence to prove or disprove that the pretrial delay impaired Smith's defense, with Smith emphasizing that the State carried the entire burden to show that the pretrial delay did not impair his defense due to the lengthy delay.

¶53 On appeal, Smith makes a sweeping statement "that there [are] at least 30 times that a witness testifying could not answer a question" due to lack of memory, but Smith fails to identify the witnesses, or their specific testimony, much less articulate how the witnesses' lapse in memory might have impaired his defense. "[W]e are not obligated to develop arguments on behalf of parties to an appeal, nor are we to guess a party's precise position, or develop legal analysis that may lend support to his position." *Barrett v. State*, 2024 MT 86, ¶ 42, 416 Mont. 226, 547 P.3d 630 (citation and internal quotations omitted). The

District Court did not err in concluding that the pretrial delay did not impair Smith's defense.

**Balancing the Four Factors**

¶54 "When balancing the four factors, the court must consider them together and with such other circumstances as may be relevant." *Daly*, ¶ 35 (citation and internal quotations omitted).

¶55 The District Court properly weighed reasons for the delay in favor of the State as Smith caused a substantial amount of the delay by absconding from supervision whereas the delay caused by the State was largely institutional. The District Court properly considered Smith's lack of a desire for a speedy trial when balancing the prejudice the pretrial delay had created. The District Court correctly concluded that the prejudice did not rise to the level of weighing it in favor of Smith as Smith failed to present any argument that the pretrial delay impaired his defense, Smith's pretrial incarceration resulted from the revocation sentence, and Smith's lack of a desire for a speedy trial informed the prejudice the District Court attributed to the anxiety and concern Smith testified to experiencing. The District Court properly balanced the four factors and denied Smith's motion to dismiss for lack of speedy trial.

¶56 *Issue 2: Whether the District Court abused its discretion by denying Smith's motion to compel.*

¶57 Prosecutors must make available to the defendant, upon request, "all . . . tangible objects that the prosecutor may use at trial or that were obtained from or purportedly belong to the defendant." Section 46-15-322(1)(d), MCA. The district court may order that

25

additional information be made available to the defendant beyond the disclosure required by § 46-15-322(1), MCA, upon a motion demonstrating the defendant (1) "has [a] substantial need [for the information] in the preparation of the case" and (2) cannot "obtain the substantial equivalent [of the information]" without "undue hardship." Section 46-15-322(5), MCA.

¶58 The District Court concluded that Smith failed to articulate a substantial need to power on the laptops to analyze the original hard drives' files and failed to articulate how the State's protocols imposed an undue hardship. The District Court determined that requiring Smith's counsel to analyze a working hard drive that contained a "perfect duplication of the [original] computer's hard drive" within the office of law enforcement or prosecutor was "acceptable" because it protected the original hard drives' data from being altered while still allowing Smith to access the exact information upon which the charges were brought.

¶59 Smith contends that denying him the opportunity to analyze the files on the original hard drives created an undue hardship because the original hard drives allegedly contained the only unaltered data. Smith does not address whether the State's protocols imposed an undue hardship but contends that the State created an undue hardship by not offering him an opportunity to analyze the original hard drives using the same forensic technology that Johnsrud used to initially copy the original hard drives' data onto the cloned hard drive. The State argues that Smith failed to establish a substantial need because he failed to

26

present evidence that demonstrated the methodology Johnsrud used to create the cloned hard drive was unreliable or that the cloned hard drive was in any way compromised.

¶60 Agent Johnsrud's uncontradicted testimony supports the District Court's determination that the cloned hard drive that Johnsrud would have used to produce a working hard drive for Smith to analyze was identical to the original hard drives. Johnsrud testified that he used forensic hardware that prevented changes from being made to the original hard drives' data to create the cloned hard drive, that he verified the cloned hard drive contained the same data as the original hard drive, and he could verify that any working hard drive would contain the same data as the cloned hard drive. Johnsrud could not testify that he actually provided Smith's counsel with a working hard drive that Johnsrud verified as accurate but that was because Smith's counsel never requested Johnsrud to provide him a working hard drive. If Smith had presented some evidence to establish that the methodology used for cloning the hard drives might have resulted in a cloned hard drive that was in any way compromised or not identical to the original hard drives, this might have provided a basis to compel production of the original hard drives notwithstanding the State's position to the contrary. But Smith failed to present any evidence that substantiated his bare accusation that Johnsrud fabricated the supplemental report to frame Smith as the laptop's user. *See City of Bozeman v. Howard*, 2021 MT 230, ¶ 17, 405 Mont. 321, 495 P.3d 72 (accused failed to demonstrate substantial need for impeachment evidence because he "did not present any evidence . . . that [the officer's testimony] was unreliable, biased, untruthful, or had a motive to testify falsely"). The

27

District Court did not err by concluding Smith failed to demonstrate a substantial need to power on the laptops to view the original hard drives' data.

¶61    Smith's assertion that he should have been offered a second method to analyze the files on the original hard drives does not undermine the District Court's conclusion that the State's protocols did not impose an undue hardship.  Johnsrud's testimony supports that a working hard drive would not only contain "the substantial equivalent" of the files on the original hard drives but that the working hard drive would contain the same *exact* files.  Johnsrud testified that Smith's counsel could have requested Johnsrud to provide Smith's counsel with a working hard drive to analyze within the office of local law enforcement or prosecutor.  Smith did not argue to the District Court, and does not argue on appeal, that this opportunity imposed an undue hardship.

¶62    The District Court did not err by concluding the State's protocol did not impose an undue hardship on Smith, by holding that Smith did not make a sufficient showing under § 46-15-322(5), MCA, and did not abuse its discretion by denying Smith's motion to compel.

¶63    *Issue 3: Whether the District Court abused its discretion under M. R. Evid.*
        *403 by admitting certain exhibits during trial.*

¶64    Evidence that is relevant and admissible may nonetheless be excluded "if the danger of unfair prejudice substantially outweighs its relative probative value."  *State v. Lake*, 2022 MT 28, ¶ 32, 407 Mont. 350, 503 P.3d 274 (citing M. R. Evid. 403).  Unfair prejudice occurs if the evidence arouses the jury's hostility or sympathy towards one party without regard to the evidence's probative value, confuses or misleads the trier of fact, or unduly

distracts from the main issue. *Colburn*, ¶ 16 (citation omitted). "District courts have broad discretion to weigh the relative probative value of evidence against the risk of unfair prejudice." *Colburn*, ¶ 17 (citation omitted).

¶65 Over Smith's objections, the District Court admitted as exhibits the search warrant inventory that documented the items that were confiscated from Smith's residence and the screenshot of the grey laptop's desktop screen. Smith and the State dispute whether the District Court abused its discretion by determining that the risk of unfair prejudice created by the exhibits did not substantially outweigh their probative value under Rule 403.[4]

¶66 Smith argues that the District Court should have redacted the marijuana and marijuana-related items categorized under "house" and "grow" from the search warrant inventory. Smith contends that including these items in the exhibit had no probative value because they do not prove an element of the charged offenses and create a substantial risk of unfair prejudice by painting Smith as a drug user and drug dealer. The State contends the search warrant inventory had probative value to establish the chain of custody over the grey laptop as it listed the grey laptop and red laptop under "house." The State argues that any unfair prejudice created by the marijuana-related items was reduced because the

---

[4] As the State correctly notes and Smith does not contest, Smith for the first time on appeal argues that the screenshot was inadmissible under Rule 404(b). Smith raised a Rule 404(b) objection to the search warrant inventory during trial but did not articulate a Rule 404(b) argument regarding this exhibit on appeal. Accordingly, we do not address the exhibits' admissibility under Rule 404(b). *State v. Strizich*, 2021 MT 306, ¶ 19, 406 Mont. 391, 499 P.3d 575 ("we do not review issues raised for the first time on appeal" absent plain error); *Herman v. State*, 2006 MT 7, ¶ 22, 330 Mont. 267, 127 P.3d 422 (we do not address unarticulated arguments).

testimony regarding Lance's drug use and drug distribution charges implied that the marijuana-related items were linked to Lance rather than Smith.

¶67    Smith's attempt to parse the admissibility of certain items listed in the search warrant inventory does not address the inventory's overall probative value.  The exhibit had probative value as a whole to demonstrate that law enforcement handled the grey laptop pursuant to proper evidentiary protocols from the point of confiscation particularly in light of Smith's insinuation that the hard drives' data had been altered between the time the Teton County Sheriff's Office confiscated them and sent them to Johnsrud for evaluation.  The State sought to admit the search warrant inventory after Deputy Groves testified that law enforcement created it to track and log the evidence they confiscated from Smith's residence.  The jury also heard testimony from Shaw, Lance, Deputy Groves, and Smith that informed them of Lance's two drug distribution charges, Lance's history of drug use, Lance's participation in drug court, and that the home search was due to Lance allegedly violating the conditions of drug court.  This testimony at the very least suggested that Lance was partly, if not wholly, responsible for the marijuana-related items, not Smith. The jury was not informed that Smith was charged for any other crimes based on the items found at his residence other than the child sexual abuse charges.  Particularly in light of the fact that the jury was apprised of Lance's involvement in drug distribution, it is a stretch to conclude that the jury would make the leap from the presence of marijuana-related items in the home to a determination that Smith was guilty of possessing child pornography.  The

District Court did not abuse its discretion by admitting the search warrant inventory because its probative value was not substantially outweighed by the risk of unfair prejudice.

¶68 Smith contends the District Court abused its discretion by admitting the screenshot of the grey laptop's desktop screen. Smith asserts that the screenshot had minimal probative value given that Johnsrud's testimony alone would have established that the laptop's desktop screen contained shortcuts to the peer-to-peer programs that were used to search for and download child pornography. The State argues the screenshot was probative because it helped prove Smith used the grey laptop and that Smith knew the laptop contained child pornography.

¶69 Beyond the contents of the desktop screen, Smith argues the desktop screen's background image unfairly prejudiced him because it created hostility towards him and distracted the jury from focusing on whether the evidence established that Smith was the user of the grey laptop. The State responds that the desktop screen's background image did not arouse the jury's hostility to an extent that prompted the jury to decide the case on an improper basis because it was a "common cartoon meme."

¶70 The desktop screen's background image was a medium-sized meme of a cartoon man pointing at the laptop's user that was accompanied by the phrase "You know, you're a sick, twisted fuck. I like that about you." The nature of the background image created little to no risk of unfair prejudice under these circumstances as it is a generic cartoon meme aimed at *the laptop's user*, that in no way specifically implicates Smith as that user. But Smith adamantly denied owning the laptop, knowing its contents, and contended that Lance

owned the laptop and was the user who downloaded the child pornography. Assuming for the sake of argument that the jury might have found the cartoon meme in poor taste or offensive, the only way it would attribute the meme to Smith is by first attributing the laptop to Smith.

¶71 District courts exercise their discretion to determine the relative probative value of an item of evidence "'when . . . less prejudicial but equally probative evidence'" is available to prove the same fact. *Lake*, ¶ 41 (quoting *Old Chief v. United States*, 519 U.S. 172, 183-84, 117 S. Ct. 644, 651-52 (1997)). District courts do not necessarily abuse their discretion by admitting two items of evidence that prove the same point. *See Old Chief*, 519 U.S. at 182-83, 117 S. Ct. at 651 ("the mere fact that two pieces of evidence might go to the same point would not, of course, necessarily mean that only one of them might come in"); *e.g.*, *State v. Cox*, 266 Mont. 110, 121-22, 879 P.2d 662, 669 (1994) (admitting autopsy photos in addition to an expert's testimony).

¶72 As the State correctly contends, the screenshot of the grey laptop's desktop screen had substantial probative value to establish two elements of the charges: possession and knowledge. The screenshot was probative to possession as it showed the desktop contained PDF files and file folders containing documents and non-pornographic photos that implicated Smith as the user of the grey laptop. The screenshot also demonstrated that the laptop's user knew the laptop contained child pornography because the user would see the shortcuts to the peer-to-peer programs on the desktop screen upon logging in, which Johnsrud testified were used to search for and download child pornography to the laptop.

32

Johnsrud's testimony as to the contents of the desktop screen provided important context for the items found on the screen and how they connected the laptop to Smith. But that testimony would have made little sense without the jury being afforded the opportunity to view the actual items that he was testifying about.

¶73 The District Court did not abuse its discretion by determining the risk of unfair prejudice did not substantially outweigh the screenshot's probative value.[5]

## CONCLUSION

¶74 The District Court did not err by denying Smith's motion to dismiss for lack of speedy trial. The District Court did not abuse its discretion by denying Smith's motion to compel. The District Court did not abuse its discretion in admitting into evidence the search warrant inventory and screenshot of the grey laptop's desktop screen.

¶75 We affirm.

/S/ JAMES JEREMIAH SHEA

We Concur:

/S/ CORY J. SWANSON
/S/ BETH BAKER
/S/ JIM RICE

---

[5] We do not reach Smith's argument regarding the cumulative error doctrine as we conclude that the District Court did not abuse its discretion in admitting the search warrant inventory and screenshot of the grey laptop's desktop screen.

Justice Katherine M. Bidegaray, concurring in part and dissenting in part.

¶76    I concur in the Court's resolution of Issue Two and Issue Three. The District Court did not abuse its discretion in denying Smith's motion to compel. On this record, the State provided forensic mirror images that constituted the substantial equivalent of the original hard drives under § 46-15-322(5), MCA, and Smith offered no evidence demonstrating that the cloning methodology was unreliable or that the mirrored data was compromised. Although Smith raised legitimate defense concerns about access to the original devices, particularly given the central role of the laptop evidence, those concerns did not ripen into the statutory showing of substantial need and undue hardship required to compel the relief requested. I also concur in the Court's conclusion that the District Court did not abuse its discretion under M. R. Evid. 403 in admitting Exhibits 8 and 11. Each exhibit carried probative value on matters genuinely disputed at trial, and the court acted within the broad bounds of its evidentiary discretion. The exhibits were not without prejudicial force, particularly the desktop screenshot, but Rule 403 requires exclusion only when unfair prejudice substantially outweighs probative value. On this record, and under deferential review, I agree the District Court did not exceed its discretion.

¶77    I respectfully dissent, however, from the Court's conclusion that Smith's right to a speedy trial was not violated. The delay here was extraordinary. From the filing of the Information to the fourth trial setting, 2,093 days elapsed. Under our law, once delay exceeds 200 days, the full four-factor analysis is triggered, the presumption of prejudice intensifies over time, and the State's burden to justify delay correspondingly increases. *State v. Ariegwe*, 2007 MT 204, ¶ 62, 338 Mont. 442, 167 P.3d 815. In my view, the Court

34

gives insufficient force to that principle and too readily treats Smith's absconding from probation as dispositive of the State's burden.

¶78    To be clear, Smith was not blameless.  The record supports that he absconded from felony supervision in an unrelated matter.  He failed to maintain contact with probation, failed to make himself available when directed, and left the country.  That conduct was wrongful, and it materially contributed to the difficulty of locating him.  I would not minimize that reality, and I would not characterize Smith as a passive victim of delay.  Indeed, Smith's supervision violations are a substantial fact that distinguishes this case from one in which an accused, without any ongoing reporting obligation, simply remains unaware that charges have been filed.

¶79    But Smith's culpability for absconding from supervision does not end the constitutional inquiry.  The question under Article II, Section 24, is not merely whether Smith disappeared.  The question is whether the State met its burden under *Ariegwe* to justify a nearly six-year delay in bringing this case to trial.  On that point, the record is too thin.

¶80    This case also reflects a concern in our recent speedy-trial decisions:  the risk that extraordinary delay will be sustained too readily when the defendant bears some share of blame and cannot show prejudice in its most concrete form.  But *Ariegwe* does not permit a one-factor analysis.  It requires a case-specific balancing of all four factors, grounded independently in Article II, Section 24, of the Montana Constitution, with the State's burden increasing as delay lengthens.  *Ariegwe*, ¶¶ 35, 62, 105.  That framework remains controlling here.

¶81 The critical period is the 1,514-day delay between the filing of the Information in April 2017 and Smith's arrest in June 2021. The Court attributes this entire period to Smith. I cannot agree the record supports charging him with all of it.

¶82 The Court relies principally on *State v. Lacey*, 2010 MT 6, 355 Mont. 31, 224 P.3d 1247, along with *State v. Houghton*, 2010 MT 145, 357 Mont. 9, 234 P.3d 904, and *State v. Eystad*, 2017 MT 29, 386 Mont. 291, 389 P.3d 1014. Those cases do establish that when a defendant voluntarily renders himself unavailable, some or all of the resulting delay should be attributed to him. But they also confirm that a defendant has no duty to bring himself to trial, and that the State's negligence or lack of diligence in bringing the accused to trial is not an acceptable reason for delay. "In short, the proper analysis under factor two requires addressing not only the reasons for the delay as they pertain to the defendant's actions but also whether the delay can be attributed to the State for failing to act diligently and in good faith to acquire jurisdiction." *Lacey*, ¶ 18.

¶83 Those cases do not relieve the State of its burden to act diligently and in good faith to obtain jurisdiction. *Lacey* expressly recognizes that obligation. *Lacey*, ¶ 17. More notably, those cases do not hold that, once a defendant absconds from supervision, the State is excused from making a meaningful record of what it actually did to locate and arrest him over a span of years. *Ariegwe* places the burden on the State to justify delay, and that burden grows heavier as the delay lengthens. *Ariegwe*, ¶¶ 62, 108.

¶84 Those cases are also not fully analogous. In *Lacey*, it was undisputed that the defendant knew of the allegations that were developing and fled to Mexico when he anticipated charges were forthcoming. *Lacey*, ¶¶ 15, 19. In addition, law enforcement in

36

*Lacey* took documented steps to pursue him, including warrant and extradition efforts and database entries. *Lacey*, ¶¶ 6, 19. This Court acknowledged that the State could have done more in *Lacey*, but the record still contained an actual showing of effort and a stronger basis to infer the defendant's flight was tied to the charged conduct. *Lacey*, ¶ 19.

¶85    Here, by contrast, the record supports that Smith absconded from probation, but it does not establish that he knew of the child-pornography charges filed in April 2017 or that he absconded to avoid prosecution on those charges. That distinction matters. It does not absolve Smith, but it does weaken the inference that the entire 1,514-day period should be laid at his feet as deliberate delay in this case. Smith's probation violations explain why he became difficult to locate; they do not, without more, establish that every day of the resulting four-year delay in this prosecution was caused by Smith rather than by a combination of Smith's unavailability and the State's limited efforts to secure jurisdiction.

¶86    In *Houghton*, we recognized that "[i]t is well established that even when an accused is outside of Montana's jurisdiction, the State must act diligently and in good faith to acquire jurisdiction." *Houghton*, ¶ 23 (citing *Lacey*, ¶ 17). Attributing delay to Houghton's avoidance of being brought to trial was proper because Houghton left Montana on the same day that reports of sexual assault by him were made, "without notifying his employer, returning his work vehicle[,] or . . . telling his wife where he was going." *Houghton*, ¶ 24. The State also acted diligently and in good faith to acquire jurisdiction over Houghton by attempting to locate and arrest him at his residence, interviewing his family and former employer, dispatching a broadcast to attempt to locate him, and entering the arrest warrant onto the NCIC database. *Houghton*, ¶ 25.

¶87    In *Eystad*, ¶ 17, the record demonstrated that Eystad had received "ample notice that he must attend the Justice Court proceedings, but . . . chose to be 'voluntarily absent' until he was arrested some years later." In contrast, the record here does not demonstrate that Smith knew charges were pending when he moved out of Montana. Again, this does not excuse Smith's failure to comply with probation. It simply means that *Eystad* does not support treating Smith's absence as conclusive proof that he deliberately avoided trial in this case.

¶88    Importantly, the record does not demonstrate the same level of State diligence that justified attribution in *Lacey*, *Houghton*, or *Eystad*. Here, for a 1,514-day period, the record remains notably sparse. The record shows that the State obtained an arrest warrant, contacted Smith's probation officer, relied on probation's attempted contact with Smith, and acted promptly once Smith was deported to Texas. Those facts are relevant and weigh against Smith. But the record does not show sustained efforts during the intervening years comparable to those in our cases: it does not show repeated warrant validation efforts, contact with family members or known associates, contact with employers, inquiry into Smith's known probation information, use of border or federal resources after he became unavailable, follow-up on possible out-of-state or international leads, or other documented attempts to locate him between 2017 and 2021. Beyond the initial warrant, contact with probation, and prompt action once Smith was deported to Texas, the State made no developed evidentiary showing of sustained efforts during the intervening four years to locate Smith or secure jurisdiction over him. On a delay of this magnitude, *Ariegwe*, *Lacey*, *Houghton*, and *Eystad* require more than general assurances that the State acted diligently;

38

our precedent requires a record establishing diligence and good faith by the State sufficient to justify assigning such an extraordinary period of delay entirely to the defendant.

¶89 The constitutional concern is not that the State did nothing at all. The concern is that the record does not show enough. Article II, Section 24, is not a mechanical doctrine under which the label "absconder" automatically resolves Factor Two. The State still bears the duty to bring the accused to trial, and the further delay stretches beyond the 200-day trigger, the more compelling the State's justification must be. *Ariegwe*, ¶ 62.

¶90 I therefore would not attribute the full 1,514 days to Smith. At a minimum, the record supports shared responsibility for that period. Smith's conduct plainly contributed to the delay, but the State did not make a sufficiently robust showing of diligence to justify assigning the entire period to him. The Court's treatment of that period effectively allows the State's burden to dissipate in the face of extraordinary delay, contrary to *Ariegwe*.

¶91 The remaining periods of delay do not rescue the State's position. The District Court attributed substantial additional time to the State as institutional delay. Institutional delay is weighed less heavily than deliberate or negligent delay, but it remains the State's responsibility in the balance and cannot be treated as constitutionally insignificant simply because it is labeled institutional. *Ariegwe*, ¶ 108. It does not disappear from the analysis. In a case involving more than 2,000 days of delay, even lesser-weighted State delay remains constitutionally significant.

¶92 Factor Three does not favor Smith. The record does not show a consistent, persistent demand for the earliest possible trial. Smith moved for at least one continuance based on counsel's unavailability, filed his speedy-trial motion relatively late, and participated in

pretrial litigation that contributed to postponement. I therefore would not weigh Factor Three in his favor. At most, it is neutral to slightly against him.

¶93 Even so, Factor Three should not carry undue weight in the State's favor. Smith's delayed assertion of the right is relevant, and I would not treat this factor as favoring him. But neither should his pretrial litigation choices or late motion practice substitute for the State's independent duty to justify a nearly six-year delay. Nor should legitimate defense motion practice be treated as inconsistent with the desire for a speedy trial merely because it required judicial attention. A defendant may seek necessary pretrial rulings without thereby assuming responsibility for the State's earlier failure to bring him to trial within constitutional limits. In this case, Factor Three informs the balance; it does not control it.

¶94 Factor Four, however, deserves more weight than the Court gives it. *Ariegwe* identifies three protected interests: preventing oppressive pretrial incarceration, minimizing anxiety and concern, and limiting impairment of the defense. *Ariegwe*, ¶ 88. While impairment of the defense is often the most important, prejudice is not limited to that category. *Ariegwe*, ¶ 88.

¶95 Smith did not make a strong showing that delay impaired the presentation of his defense. On that point, I agree the record is weak. He did not identify with precision which witnesses' faded memories deprived him of specific exculpatory testimony, nor did he show that particular evidence became unavailable because of the delay. I therefore would not rest the speedy-trial violation on impairment of the defense. But he did offer unrebutted testimony of substantial personal prejudice: chronic gastrointestinal bleeding, repeated hospitalizations, severe anxiety and depression, numerous medication changes,

40

mental-health deterioration, and significant strain on his marriage and finances. Those harms do not vanish simply because some incarceration also resulted from revocation of his prior sentence. The proper question is whether the unresolved prosecution unduly prolonged or aggravated the disruption and anxiety inherent in the criminal process. *Ariegwe*, ¶ 88.

¶96 On this record, I would conclude that it did. The delay here was not ordinary, and neither were the asserted harms. The State did not present highly persuasive evidence rebutting Smith's showing of personal prejudice. In a case of this duration, the absence of a stronger State showing matters. Although Smith's revoked sentence complicates the prejudice analysis and reduces the force of his oppressive-incarceration argument, it does not eliminate prejudice altogether. The unresolved charges carried independent consequences for anxiety, uncertainty, institutional placement concerns, family disruption, and the practical burdens of preparing for trial while incarcerated. At a minimum, Smith's unrebutted testimony established more than the ordinary stress inherent in being accused of a serious crime.

¶97 Balancing the four factors, I reach a different conclusion from the Court. Factor One strongly favors Smith because the delay was extraordinary. Factor Two does not favor the State because, although Smith bears real responsibility for absconding from supervision, the State failed to make a sufficiently developed showing of diligence to justify attributing the full 1,514-day pre-arrest period to him. Factor Three is neutral to slightly against Smith. Factor Four favors Smith because the record establishes significant personal prejudice that the State did not persuasively rebut. I do not conclude that each

factor favors Smith or minimize Smith's role in creating the difficulty of locating him. But *Ariegwe* requires a balancing, and the balance changes when the delay is this long, the State's diligence showing is this limited, and the prejudice evidence is unrebutted.

¶98    When the factors are weighed together, I would hold that Smith's speedy-trial right was violated. The delay was extraordinary. Smith bears genuine responsibility for some of it. But the State did not make a sufficiently developed showing of diligence to justify attributing the full 1,514-day pre-arrest period to him, and it did not persuasively rebut the significant personal prejudice he described. On this record, the balance required by *Ariegwe* favors dismissal, not affirmance.

¶99    Because the State did not meet its burden to justify the delay under *Ariegwe*, I would reverse Smith's convictions and dismiss the charges. I therefore concur in part and dissent in part.

/S/ KATHERINE M. BIDEGARAY

Justices Ingrid Gustafson and Laurie McKinnon join in the concurring and dissenting Opinion of Justice Katherine M. Bidegaray.

/S/ INGRID GUSTAFSON
/S/ LAURIE McKINNON